**AIR NEW ZEALAND LIMITED,**
**Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
**Respondent,**

**Pan American World Airways,**
**Inc., Intervenor.**

**No. 82–2165.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 19, 1983.
Decided Feb. 3, 1984.

William C. Clarke, New York City, with whom James D. Tussing, New York City, was on the brief, for petitioner.

David Schaffer, Atty., C.A.B., Washington, D.C., with whom Ivars V. Mellups, Acting Gen. Counsel, and Thomas L. Ray, Acting Associate Gen. Counsel, C.A.B., John J. Powers, III, and Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondent. Robert B. Nicholson, Atty. Dept. of Justice, Washington, D.C., also entered an appearance for respondent.

Jerry W. Ryan, Washington, D.C., was on brief, for intervenor.

Before WRIGHT and SCALIA, Circuit Judges, and WEIGEL,* Senior District

Judge for the United States District Court for the Northern District of California.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

Air New Zealand, Limited ("ANZ") petitions under 49 U.S.C. § 1486 (1976) for review of an order of the Civil Aeronautics Board granting it exemption authority to carry persons, property, and mail between Los Angeles and London on flights originating or terminating in New Zealand. The object of its challenge is a condition in the order which recites that the exemption authority will automatically terminate should the aviation regulatory authorities of New Zealand fail to approve an authorized United States carrier's fares equal to ANZ's fares for travel between the same points. This condition evidently operates even where the ANZ fares are limited to through-flights, without transfer or stopover privileges, and the United States carrier's fares are not. ANZ contends that for this reason the condition violates international obligations, and that in any event the automatic termination of its operating authority without further Board action would be procedurally invalid. The main question presented is the ripeness of this matter for our review.

I

The governments of the United States and New Zealand are parties to an air transport agreement which gives route authority in each country to those carriers designated by the other and contains provisions covering other aspects of air service, including fares. *United States-New Zealand Air Transport Agreement,* entered into force June 24, 1964, 15 U.S.T. 1362, T.I.A.S. No. 5605, *as amended* November 25, 1980, T.I.A.S. No. 9956. The United States has designated Continental Airlines and Pan American World Airways, and New Zealand has designated Air New Zealand, to provide air service between the two countries. The

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

air transport agreement provides (Article 3) that designated carriers must receive operating authority from the regulatory authorities of both nations. In the United States, foreign carriers must receive a permit from the CAB. 49 U.S.C. § 1372 (1976 & Supp. V 1981). The Board may grant an exemption from this requirement when it finds that would be in the public interest. 49 U.S.C. § 1386(b) (1976 & Supp. V 1981).

In June 1982 ANZ simultaneously applied for an amendment to its permit to allow New Zealand-London service via Los Angeles, and for an exemption to allow it to initiate and continue to operate that service for up to one year, pending Board action on its permit application. In anticipation of this new service, ANZ received the permission of the United Kingdom and New Zealand aviation authorities to offer two reduced fares on its New Zealand-Los Angeles-London flights: one a temporary introductory fare, the other a 5% discount from the advance purchase excursion fare otherwise available. The two reduced fares were only available on through-plane service which did not allow passenger stopovers en route.

On July 9, 1982, Pan American filed new tariffs with the New Zealand aviation authorities seeking to match ANZ's reduced fares, but without the through-plane limitation. On July 27, 1982, Continental filed a joint fare (i.e., a fare to be shared with another airline), matching the discount for passengers using its New Zealand-Los Angeles service who would connect with another carrier to continue travel to London. (Trans World Airlines later advised the New Zealand authorities that it would provide service under these joint fares on the Los Angeles-London segment.) The United States-New Zealand air transport agreement (Article 11, ¶ 5) forbids the signatories to prevent or inhibit designated airlines from matching a fare offered by any other designated airline for flights to third nations. Nevertheless, New Zealand refused to approve the Pan American and Continental fares. It took the position that because the reduced ANZ fare was justified by the cost-savings inherent in through-plane service, a limitation the United States carriers did not propose to impose, the Pan American and Continental fares were not genuinely "matching." Ultimately, the United States carriers withdrew their fare approval requests.

The CAB regarded New Zealand's refusal to approve the American carriers' fares as a violation of the air transport agreement's fare-matching clause. Relying on Article 4 of the agreement, which permits either party to withhold operating authority where the other is not in compliance with the agreement, the Board refused to grant ANZ's exemption authority request. New Zealand later withdrew its approval of ANZ's reduced fares,[1] whereupon the Board

1. In its brief to this court, the Board contends that this withdrawal, and the Board's grant of exemption authority subject to condition, were agreed to by the regulatory authorities of the two countries after discussions held under that provision of the air transport agreement (Article 11, ¶ 7) permitting either of them to request "urgent consultations" if they feel the interests of their designated airlines have been "unduly affected" by the implementation of the fare-matching provisions. A letter from Matthew V. Scocozza, Deputy Secretary of State for Transportation and Telecommunication, to CAB Chairman Dan McKinnon, appended to the Board's brief, claims that this arrangement was agreed to by the two governments as an "interim resolution" while they continue "a diplomatic effort to resolve their differences" on interpretation of the fare-matching provisions. On the other hand, a letter from A.J. Healy, New Zealand's Secretary for Transport, to N.M.T. Geary, ANZ's Chief Executive, appended to Petitioner's Reply Brief, asserts that the New Zealand authorities' withdrawal of approval for the ANZ discount fares was "decided unilaterally," that "[a]t no stage ... did New Zealand agree to any conditions imposed by the CAB," and that no diplomatic consultations or requests for consultations under the air transport agreement have occurred since the CAB exemption authority was granted. Our disposition of this case makes it unnecessary to resolve either the facts of this dispute or its effect upon our authority. Similarly, we do not reach the effect of Article 13 of the air transport agreement, which provides that "any dispute between the Contracting Parties relative to the interpretation or application of this Agreement. which cannot be settled through consultation shall be submitted for an advisory report to a tribunal of three arbitrators," and

granted ANZ's exemption authority[2] and ANZ initiated its New Zealand-Los Angeles-London service. The exemption authority was limited, however, by the condition that is the subject of the present suit:

> This exemption authority is contingent upon the New Zealand authorities approving any U.S. carrier fare (including interline and intraline fares) that matches any price charged for transportation by Air New Zealand Limited over the route, and will terminate automatically without further Order of the Board upon New Zealand's failure to approve any U.S. carrier fare (including interline and intraline fares) set at the same amount as that charged by a New Zealand carrier for travel between the same origin and destination points.

*Air New Zealand, Limited,* Docket No. 40753, slip op. at 3 (Aug. 20, 1982) (order granting exemption).

In this petition for review ANZ contends that because the condition violates the United States-New Zealand air transport agreement it is invalid under § 1102(a) of the Federal Aviation Act, which requires the Board to exercise its powers and duties consistent with international obligations. 49 U.S.C. § 1502(a) (Supp. V 1981). The petitioner also contends that the automatic termination feature is invalid because § 1005(f) of the Federal Aviation Act, 49 U.S.C. § 1485(f) (1976), requires a factfinding proceeding (subject to judicial review) before a substantive action such as termination of operating authority can be taken.

## II

■ The doctrine of ripeness is an important element of our judicial tradition, and indeed—in some applications at least—of the "case or controversy" requirement of the Constitution itself. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974). *See*

*generally* G. GUNTHER, CASES AND MATERIALS ON CONSTITUTIONAL LAW 1655–66 (10th ed. 1980). In the specific context of reviewing administrative action, the purpose of the doctrine is, according to the Supreme Court's opinion in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." We think that doctrine has strong application here.

*Abbott Laboratories* and its two companion cases set forth with considerable clarity the criteria for application of the doctrine of ripeness to the review of agency action. *Abbott Laboratories* itself involved a challenge by prescription drug manufacturers to regulations issued by the Secretary of Health, Education, and Welfare requiring the established name of a drug to be printed prominently on all labels and printed material accompanying the drug. In finding that the case was ripe, the Court noted that ripeness depends on "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct. at 1515. In the case before it, the Court found that the legal issues presented were fit for judicial review since, although "the justification for [the] rule might vary with different circumstances, ... both sides have approached [the] case as one purely of congressional intent." *Id.* And the stark choice imposed upon the manufacturers if review were withheld (the high cost of compliance, on the one hand, and the risk of severe sanction for noncompliance, on the other) would constitute a significant hardship.

that "[t]he Contracting Parties will use their best efforts under the powers available to them to put into effect the opinion expressed in any such advisory report."

2. ANZ's exemption authority was for a single year. *See Air New Zealand, Ltd.,* Docket No. 40753 (Aug. 20, 1982). On August 4, 1983, ANZ filed an application to renew it. The CAB has not acted on ANZ's permit application.

Application of the *Abbott Laboratories* test was clarified in two other cases decided the same day. In *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), a group of cosmetic manufacturers challenged an FDA regulation which allowed the Commissioner of Food and Drugs to suspend the certification of any person refusing FDA employees free access to the facilities, processes, and formulae used in the manufacture of color additives. The Court held the regulation not ripe for review. Since suspension of certification was discretionary under the rule, the Court believed that "judicial appraisal of [the relevant] factors is likely to stand on a much surer footing in the context of a specific application of [the] regulation than could be the case in the framework of the generalized challenge made here." *Id.* at 164, 87 S.Ct. at 1524. As to the hardship factor, the Court found that this was not a situation where "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs," *i.e.,* where "primary conduct is affected"; and that "no irremediable adverse consequences flow from requiring a later challenge." *Id.* In *Gardner v. Toilet Goods Association, Inc.,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), the Court held that an FDA regulation defining "color additives" to include all dilutants was ripe for review before enforcement. It found that "this is not a situation in which consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to enforce the regulations," *id.* at 171, 87 S.Ct. at 1528. Moreover, the impact of the regulations was to require the plaintiffs either to withdraw products from the market pending expen-

sive FDA clearance procedures or risk civil and criminal penalties and public opprobrium.

*Abbott Laboratories* and its companion cases were suits for so-called "nonstatutory" judicial review, *i.e.,* actions in district court under that provision of the Administrative Procedure Act which provides that "in the absence or inadequacy" of a "special statutory review proceeding relevant to the subject matter," the form of proceeding for judicial review is "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703 (1982). More specifically, those cases involved actions for injunction and declaratory judgment; and as the Supreme Court noted at the very outset of its ripeness discussion in *Abbott Laboratories,* "[t]he injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." 387 U.S. at 148, 87 S.Ct. at 1515.

■ This is not an injunction or declaratory judgment action. There is no doubt, however, that the ripeness principles elaborated in such cases apply as well to suits under special statutory review provisions such as § 1006 of the Federal Aviation Act, 49 U.S.C. § 1486. Specific provisions for judicial review of administrative action are relatively new to our legal system, which previously relied for that purpose upon the so-called prerogative · writs, particularly mandamus, certiorari and injunction. *See generally* L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 152–96 (1965). Except as otherwise specified,[3] the review

---

**3.** Perhaps the most common specification is a provision making the statutory review available to all persons "adversely affected" instead of only those suffering "legal wrong," to whom nonstatutory review was originally limited. See, for example, the judicial review provision of the Federal Communications Act, 47 U.S.C. § 402(b)(6) (1976); *FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 476–77, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940). The Supreme Court has interpreted the Administrative Procedure Act

to confer this expansion of standing upon all non-statutory review proceedings. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 154–55, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). By virtue of its incorporation by reference in (and, as just noted, alteration by) the APA, see 5 U.S.C. § 703, quoted in text, all nonstatutory review is now, in a sense, statutory review; so the pre-APA

which the statutory provisions contemplate is the same as that provided under the common-law writs—as that may change, of course, over time. Basic limitations upon "non-statutory review" that may originally have been justified on theories of equitable discretion subsist in "statutory review" on the theory that this is the legislative expectation and intent. Thus, although the *Abbott Laboratories* trilogy was composed of nonstatutory review cases, they relied for their ripeness analysis upon cases that were not. *E.g., Columbia Broadcasting System v. United States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), cited in *Abbott Laboratories* at 387 U.S. 149–50, 87 S.Ct. 1515–16 and in *Toilet Goods Association* at 387 U.S. 163, 164, 87 S.Ct. 1524; *FCC v. American Broadcasting Co.,* 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954), cited in *Toilet Goods Association* at 387 U.S. 164, 87 S.Ct. 1524; *Frozen Food Express v. United States,* 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956), cited in *Abbott Laboratories* at 387 U.S. 150, 87 S.Ct. 1516, and in *Toilet Goods Association* at 387 U.S. 162, 87 S.Ct. 1523; *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), cited in *Abbott Laboratories* at 387 U.S. 151, 87 S.Ct. 1516, and in *Toilet Goods Association* at 387 U.S. 162, 87 S.Ct. 1523. With specific reference to the statutory review provision here at issue, 49 U.S.C. § 1486, an en banc opinion of this court has applied without question the *Abbott Laboratories* test of ripeness. *Continental Air Lines, Inc. v. CAB,* 522 F.2d 107, 122 (D.C.Cir.1975) (on rehearing en banc).

### III

■ Applying the dual *Abbott Laboratories* test of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration," *Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. at 1515, we conclude that this case is not ripe for review. We consider first the substantive challenge to the condition.

As to fitness of the issue: The issue presented here is of the sort involved in *Toilet Goods Association, supra.* Its outcome depends upon the facts. Petitioner has argued the case as though the only fares to which the condition would apply are those similar to the ANZ fares (and the "matching" U.S. carrier fares) recently withdrawn. In fact, however, such fares are only a small part of what the condition includes, and the same legal issues are not presented (or their outcomes are not the same) in all contexts. Even the petitioner would concede that New Zealand's failure to approve equal-priced intraline fares where there is no transfer would violate the international agreement and justify termination of ANZ's operating rights. Likewise, its failure to approve equal-priced intraline fares with transfer, and interline fares, where the matched price *itself* permits transfer. No one asserts, in other words, that the Board's condition is, in all its applications, substantively invalid. Yet petitioner would have us examine it and strike it down on its face, despite its valid applications, because of an allegedly invalid application which does not now and may never exist. Moreover, even with regard to its questionable applications, the validity of the condition may depend upon a number of factual variables—for example, whether the matched fare was itself cost justified, or whether the actual costs of the United States carrier, even including transfer costs, remain lower than the costs of the carrier whose fare is matched. In these circumstances, the legal issue of the condition's compliance with the international agreement is not fit for abstract review.

With regard to the second test of ripeness, "the hardship to the parties of withholding court consideration," *Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. at 1515, the present case likewise fares (so to speak) poorly. Again it resembles *Toilet Goods Association, supra,* since the challenged agency action does not affect the primary conduct of the complaining party and its adverse consequences can be avoided by later judicial challenge. Unlike the plaintiffs in *Abbott Laboratories* and *Gard-*

---

terminology, while still generally employed, has become a misnomer.

*ner,* this petitioner is not put to the choice of either obeying an agency command it believes unlawful or else risking substantial penalty. The condition is not even addressed to conduct of ANZ, but rather to conduct of the New Zealand regulatory authorities. The only conceivable effect upon ANZ's primary conduct is that it may be deterred from resubmitting its prior fare proposal to New Zealand authorities, out of fear that this might set in motion a chain of events that would ultimately cause those authorities to violate the condition. That effect is too indirect, and also too weak, since it rests upon anticipation of an eventuality that is, to say the least, improbable. Action by New Zealand authorities of the sort that would violate the condition was not the outcome, after all, the last time ANZ's reduced fares were proposed, and there is little reason to believe that a rerun of the diplomatic maneuvering would produce *anything* other than the same impasse—unless it would be resort by one government or the other to the compulsory arbitration provision of the air traffic agreement (Article 13) for resolution of the interpretive dispute. Here, therefore, as in *Toilet Goods Association,* there is no way that "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs." *Toilet Goods Association, supra,* 387 U.S. at 164, 87 S.Ct. at 1524. The impact of the condition will be felt, if at all, when the automatic termination occurs, and "no irremediable adverse consequences flow from requiring a later challenge" at that time. *Id.*

▮ Finally, we consider the application of these ripeness tests to petitioner's second claim, that in providing for automatic termination of ANZ's exemption authority "without further Order of the Board," the condition violates the Federal Aviation Act's requirement for a fact-finding proceeding which would be subject to judicial review. Petitioner relies principally upon § 1005(f) of the Act, 49 U.S.C. 1485(f), which provides that "[e]very order of the ... Board shall set forth the findings of fact upon which it is based." Petitioner

asserts that this must be read to require the Board to conduct fact-finding proceedings before taking action of such substantive effect as the termination of operating authority. It seems to us, however, that if automatic termination violates this or any other provision—an issue we do not reach—it does so if and when automatic termination occurs. (The mere adoption of a condition envisioning automatic termination surely does not require a factual hearing, since the facts producing termination are yet to occur.) We might be fully able to decide the legality of future automatic termination now, in the abstract—and thus the first part of the *Abbott Laboratories* ripeness test may be satisfied. But the second part, the requirement of "impact ... felt immediately," *Toilet Goods Association, supra,* 387 U.S. at 164, 87 S.Ct. at 1524, is not remotely met. If, as we have concluded above, the condition's specification that the CAB will terminate ANZ's operating authority when New Zealand refuses to permit "matching" fares does not immediately affect primary conduct and produce adverse consequences irremediable at a later date; much less so does the incidental provision that such termination will not be preceded by a hearing.

As to both the substantive and the procedural objections to the Board's action, the short of the matter is that there will be time enough to consider petitioner's complaints of illegality, and to protect petitioner from the consequences, if and when the Board seeks to assert that the termination envisioned in the condition has occurred. Until then the normal administrative process, which in this case includes the diplomatic process as well, must be permitted to operate unimpaired.

*Petition Denied.*