ALASCOM, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

ISA Communications Services, Inc., Intervenor.

PEOPLE OF the STATE OF CALIFORNIA and the Public Utilities Commission of the State of California, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

ISA Communications Services, Inc., Intervenor.

NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Southern Pacific Communications Co., ISA Communications Services, Inc., GTE Telenet Communications Corporation, Satellite Business Systems, U.S. Telephone and Telegraph Corporation, Tymnet Inc., MCI Telecommunications Corporation, Intervenors.

---

NATIONAL ASSOCIATION OF REGU-
LATORY UTILITY COMMISSION-
ERS, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

ISA Communications Services,
Inc., Intervenor.

Nos. 82–1907, 82–2001, 81–1556
and 82–1871.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 26, 1983.

Decided Feb. 17, 1984.

Peter G. Fairchild, Sacramento, Cal., with whom J. Calvin Simpson, San Francisco, Cal., was on brief, for People of State of Cal. and the Public Utilities Com'n of State of Cal., petitioners in No. 82–2001.

Alan Y. Naftalin, Washington, D.C., with whom Margot Smiley Humphrey and Gregory C. Staple, Washington, D.C., were on brief, for Alascom, Inc., petitioner in 82–1907.

Paul Rodgers, Charles D. Gray and Deborah A. Dupont, Washington, D.C., were on brief for National Ass'n of Regulatory Utility Com'rs, petitioner in 81–1556 and 82–1871.

John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Bruce Fein, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Lisa B. Margolis, Counsel, F.C.C., Andrea Limmer and Barry Grossman, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents. Stephen A. Sharp, Counsel, F.C.C., Marion L. Jetton, John J. Powers, III, and Stephen F. Ross, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Richard M. Singer, Washington, D.C., F. Thomas Tuttle, Kevin H. Cassidy, J. Man-

ning Lee, McLean, Va., and Jeffrey H. Matsuura were on brief for intervenor, Satellite Business Systems. Harold David Cohen and Jack N. Goodman, Washington, D.C., also entered appearances for intervenor.

Stephen R. Bell, Paul J. Sinderbrand, Philip M. Walker and Donald Ward, Washington, D.C., were on joint brief for intervenors, Tymnet, Inc. and GTE Telenet Communications Corp.

David D. Kradell, Hayward D. Fisk, Carlisle, Pa., R. Michael Senkowski and John W. Hunter, Washington, D.C., entered appearances for intervenor, ISA Communications Services, Inc.

Daniel A. Huber, Washington, D.C., entered an appearance for intervenor, Southern Pacific Communications Co.

Peter M. Andersen, New York City, entered an appearance for intervenor, U.S. Tel. and Tel. Corp.

Kenneth A. Cox, Washington, D.C., Philip S. Nyborg, Arlington, Va., Ruth S. Baker-Battist, William J. Byrnes, John M. Pelkey, and Michael H. Bader, Washington, D.C., entered appearances for intervenor, MCI Telecommunications Corp.

Before TAMM and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge.

This case involves a decision of the Federal Communications Commission (FCC) to reallocate radio spectrum for use in connection with a new communications common carrier service, Digital Electronic Message Service (DEMS).[1] DEMS is a nationwide system for the "high-speed, end-to-end, two-way transmission of digitally encoded information,"[2] and was designed primarily to meet the need of business and government organizations for electronic document distribution, computer data transfer, and teleconferencing services between widely dispersed offices located in major U.S. cities.[3] DEMS systems will consist of both an intercity transmission component and a local distribution component. Satellites and terrestrial microwave facilities, both of which have been available for some time, will be used to broadcast intercity transmissions. The local distribution component, known as the Digital Termination System (DTS), was the subject of the rulemaking presented to this court for review.

As originally proposed by the Xerox Corporation (Xerox),[4] the DTS is comprised of user stations, "local nodes," and "city nodes," which carry information in both directions between a subscriber's premises and an intercity satellite earth station or microwave network. The user station is a microwave radio station, or "transceiver," with an antenna located on the customer's roof. The user station sends or receives information to or from another microwave

1. *See Digital Termination Systems (First Report and Order),* 86 F.C.C.2d 360 (1981), aff'd on reconsideration, 90 F.C.C.2d 319 (1982) [hereinafter "the Order"].

2. *Notice of Proposed Rulemaking and Inquiry,* 44 Fed.Reg. 51,257, 51,258 (1979) [hereinafter *Rulemaking Notice*]. "Digital encoding" refers to the process by which information is translated into a stream of "off"/"on" pulses; the only two message elements in a digital transmission are "on" and "off." This binary code is the language of most computers and other business machines. In contrast, telephone and other voice carriers generally employ analog transmissions to send voice messages. In analog transmissions the radio signal varies continuously in the same way that variations in air pressure convey the sound one hears without

the aid of communications devices. Although any kind of information can be transmitted in either digital or analog form, conversion devices are necessary for voice use of digital systems or for computer uses of analog systems. FCC Brief at 5 n. 1; *see* J. Brown & E. Glazier, Telecommunications 14–22, 181–204 (1974); J. Martin, Telecommunications and the Computer 112–13, 263–78 (1976).

3. *Rulemaking Notice, supra* note 2, at 51,258.

4. Xerox abandoned its DEMS proposal in 1981, but other carriers remain interested in the development of DEMS systems. *See Digital Termination Systems (Reconsideration Order),* 90 F.C.C.2d 319, 321 n. 4 (1982) [hereinafter "Reconsideration Order"].

station, the "local node," which serves a number of users. Messages are then relayed via microwave between the local node and yet a third microwave station, the "city node." The city node acts as a central switching point for intracity communications among nodes, as well as for interconnections with satellites and microwave networks for intercity communications.

After considering the comments filed by twenty-nine parties and the reply comments of eleven parties, the FCC concluded that a reallocation of spectrum for DTS advanced the public interest. The Commission found unanimously that "[t]he services to be provided over DTS offer the potential for satisfying digital communications needs that are presently unmet as well as providing a competitive alternative to monopoly carriers providing existing local distribution services." [5] Accordingly, the Commission reallocated to use for DTS and internodal links 130 MHz in the 10.6 GHz band, a lightly used spectrum previously dedicated to privately operated mobile radio services,[6] and adopted limited technical specifications and regulations governing the construction and operation of DTS.[7]

Although none of the parties before this court contests the FCC's decision to allocate spectrum for use by DTS, several other aspects of the DTS Order have been challenged as unlawful. First, petitioners National Association of Regulatory Utility Commissioners (NARUC)[8] and the State of California and the Public Utilities Commis-sion of the State of California (California) contend that the Order's expression of intent to preempt state regulation of DTS and DEMS that is inconsistent with federal policy and regulations exceeded the scope of the FCC's statutory jurisdiction and violated the Communications Act of 1934.[9] Second, NARUC and Alascom, Inc. (Alascom) maintain that the Order was arbitrary and capricious in that it failed to address the impact which "by-pass" of the existing telephone network by DEMS carriers would have upon revenues now used to support rural telephone service. Finally, Alascom argues that the Order arbitrarily and capriciously failed to exclude Alaska from the DEMS proceedings. The FCC and intervenors[10] contend both that the issues presented by petitioners are not ripe for judicial review and that the decisions announced in the Order were a reasonable exercise of the Commission's discretion. Because we agree that none of the issues raised by petitioners represents a concrete controversy now ripe for consideration by this court, we dismiss the petitions without reaching their merits.

## I. THE RIPENESS STANDARD

■ The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way

---

5. *Digital Termination Systems (First Report and Order),* 86 F.C.C.2d at 363.

6. *See* 47 C.F.R. § 2.106 (1980).

7. On petition for reconsideration, the FCC modified some of these regulations. *See* 90 F.C.C.2d 319 (1982). None of the technical aspects of the FCC Order are before this court.

8. NARUC is a quasi-governmental organization the membership of which includes the governmental agencies responsible for the regulation of carriers and utilities in each of the fifty states, the District of Columbia, Puerto Rico, and the Virgin Islands.

9. 47 U.S.C. §§ 35, 151–609 (1976 & Supp. V 1981).

10. Intervenors Charles Firestone, Satellite Business Systems (SBS), Tymnet, Inc. (Tymnet), GTE Telenet Communications Corporation (GTE), ISA Communications Services, Inc. (ISA), Southern Pacific Communications Company (Southern Pacific), U.S. Telephone and Telegraph Corporation (U.S. T & T), and MCI Telecommunications Corporation (MCI) were, at the time of the Commission's proceeding, potential entrants into DTS or similar communications services. Intervenors' Briefs for Mr. Firestone and SBS and a joint brief by Tymnet and GTE were submitted in support of the FCC's position. Mr. Firestone was granted leave to withdraw as an intervenor by order of the court on May 17, 1983, prior to oral argument.

by the challenging parties." [11] Ripeness is determined by evaluating "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." [12]

If no substantial hardship to the parties will result from deferral, a court generally will review an order only when it can be tested in a concrete factual setting. Judicial appraisal of a question stands "on a much surer footing in the context of a specific application ... than could be the case in the framework of the generalized challenge." [13] If, however, "the issue tendered is a *purely* legal one," [14] in which no further facts need be developed to facilitate a proper judicial decision, a *final* agency action [15] may be fit for judicial review even though it has never been applied or enforced by the agency in a concrete setting.

A case may lack ripeness, however, even when it involves a final agency action presenting a purely legal question.[16] The second prong of the ripeness test requires that the contested action impose an impact on the parties "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." [17]

In *Abbott Laboratories v. Gardner,* [18] the Supreme Court found such an impact where an agency action imposed on the parties a serious dilemma: " 'Either they must comply with every time requirement and incur the costs of changing over their promotional material and labeling or they must follow their present course and risk prosecution.' " [19] The mere *potential* for future injury, however, is insufficient to render an issue ripe for review. For example, in *Toilet Goods Association v. Gardner,* [20] the Court found unfit for review a challenge to a regulation authorizing an agency to suspend the certification of any person refusing to permit agency inspections. Although the case involved final agency action and presented the purely legal question of the statutory authority of the Food and Drug Commission,[21] the Court declined review of the regulation because no specific inspections had yet been ordered. No immediate response to the regulation was required of manufacturers, nor would any "irremediable adverse consequences flow" from deferring review until a specific inspection had been ordered by the agency and refused by a manufacturer.[22] Thus, to

---

**11.** *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967). For a discussion of *Abbott Laboratories* and its implications for petitions for review of agency actions, *see Air New Zealand Ltd. v. CAB,* 726 F.2d 832 at 835–837 (D.C.Cir. 1984).

**12.** *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515.

**13.** *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967).

**14.** *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515 (emphasis supplied).

**15.** The Supreme Court in *Abbott* took particular note of the fact that no further administrative proceedings were contemplated with respect to the matter before the Court in that case. *Id.; see also id.* at 149–51, 87 S.Ct. at 1515–17.

**16.** *See, e.g., Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Air New Zealand Ltd. v. CAB,* 726 F.2d 832 at 838 (D.C.Cir.1984).

**17.** *Abbott Laboratories,* 387 U.S. at 152, 87 S.Ct. at 1517.

**18.** 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

**19.** *Id.* at 152, 87 S.Ct. at 1517 (quoting from the district court findings in *Abbott Laboratories v. Celebrezze,* 228 F.Supp. 855, 861 (D.Del.1964), *rev'd,* 352 F.2d 286 (3d Cir.1965), *rev'd,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

**20.** 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

**21.** *Id.* at 162–63, 87 S.Ct. at 1523–24. The Court did note, however, that, because of the broad grant of statutory authority to promulgate enforcement regulations, the reasons given by the Commissioner to justify a specific inspection order might be relevant to the legal question at hand. *Id.* at 163, 87 S.Ct. at 1524.

**22.** *Id.* at 164, 87 S.Ct. at 1524; *see also Baltimore Gas & Elec. Co. v. ICC,* 672 F.2d 146, 148–49 (D.C.Cir.1982) (hypothetical state of affairs is insufficient to support review) (agency regulation not subject to pre-enforcement re-

be ripe for review an administrative action must impose an actual, not a prospective, hardship by creating a dilemma in which a party "must choose between disadvantageous compliance and risking serious penalties" for noncompliance.[23]

## II. THE PETITIONS FOR REVIEW

### A. *The Preemption Issue*

In its *Notice of Proposed Rulemaking,* the FCC queried whether intrastate use of DTS services would be "so *de minimis* as to justify preemption of state regulation on the ground that any intrastate communications will be only ancillary to an interstate communications service."[24] Having weighed comments on this issue and having concluded that reallocation of spectrum and an open entry policy for rapid development of nationwide DTS services were in the public interest, the FCC declared:

To promote these policy goals we have established only minimal technical regulation to allow maximum freedom in network design, have imposed no regulatory restrictions on interconnection, and intend to impose only minimal regulation, to the extent feasible, in all other areas. Our policy goals, however, could [b]e frustrated by restrictive state regulation, particularly as to entry and technical standards. In addition, state regulation could increase the delay in implementation of service and add to the expense of providing service. It is our *intention,* therefore, to preempt *inconsistent* state regulation of technical standards, market entry standards, and rates and tariff reg-

ulations of all carriers using DTS facilities.[25]

The State of California, concerned that the FCC might have preempted all state regulation over even wholly intrastate aspects of DTS service, petitioned the FCC for reconsideration of this aspect of its Order. The FCC responded:

We believe that the State of California may have misinterpreted our order with respect to preemption. We did not state, nor did we intend, to preempt all state regulation regardless of its effect upon interstate services or national policy goals. We see no need to foreclose legitimate state policies as long as they are not inconsistent with our national DEMS regulatory policy and do not burden the rendition of interstate DEMS service. *Should a question ever arise as to whether a particular state regulation is, or may be, inconsistent with our national DEMS regulatory policy, we stand ready to rule on its consistency or lack thereof expeditiously.*[26]

Despite this explanation on the part of the Commission, both NARUC and California argue that preemption of state regulation of intrastate DTS activity has occurred and that such preemption exceeds the bounds of FCC's statutory authority.

We believe that the language employed by the FCC Orders, taken together with the fact that there are at present no state regulations aimed at DTS/DEMS carriers,[27] makes clear that no preemption has thus far occurred. As a result, this issue seems

view when adverse effect on complainant is "minimal" because their business activities would not be significantly affected); *National Automatic Laundry & Cleaning Council v. Shultz,* 443 F.2d 689, 699 (D.C.Cir.1971) ("Aversion to hypothetical inquiries relates to the essence of the judicial function, restricted by the Constitution to cases and controversies . . . .").

**23.** 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 25:6, at 369 (1983) (emphasis omitted); *see Midwestern Gas Transp. v. FERC,* 589 F.2d 603, 619–20 (D.C.Cir.1978).

**24.** *Rulemaking Notice, supra* note 2, at 51,265.

**25.** *Digital Termination Systems (First Report and Order),* 86 F.C.C.2d at 389–90 (emphasis supplied).

**26.** *Digital Termination Systems (Reconsideration Order),* 90 F.C.C.2d at 333.

**27.** Nor were any such regulations in effect at the time the FCC adopted its Order. *See* SBS Brief at 9. Counsel at oral argument were unable to direct the court's attention to a single state regulation that has been displaced by the FCC Orders.

peculiarily unfit for judicial resolution in the present posture of this case.

First, the agency's announcement of its intent to preempt inconsistent state regulations should they arise does not constitute reviewable final action by the agency. The Reconsideration Order explicitly indicates the intent of the agency to conduct further administrative proceedings to determine whether a given state regulation is inconsistent with national DEMS policy. No specific state regulation is preempted. No attempt is made to define the sorts of state regulations that might be deemed inconsistent or unduly burdensome on interstate DEMS service.[28] In fact, the language petitioners find objectionable seems to be little more than a gratuitous assertion of the FCC's authority to preempt some regulations in appropriate circumstances. As this court has previously observed:

> Congress explicitly limited our review to agency orders. If we were to construe that term to encompass every agency move which might cause someone future harm, we would in effect be reading the congressional limitation out of existence by permitting review whenever there existed a petitioner with a motive for seeking it .... Such a reading would be entirely implausible. It would cause con-

siderable mischief. It would in effect permit the Courts of Appeals at the whim of parties not otherwise aggrieved to scrutinize administrators' passing remarks, overturn their subsidiary factual determinations, and stalk their every step along alternative paths of reasoning. The result would be a heavy burden on court and agency alike.[29]

The mere expression of an agency's intention to preempt some presently nonexistent state regulation which might be found in some future agency proceeding to be inconsistent with federal DTS policy is not reviewable final action.

Moreover, the issue of the FCC's authority to preempt inconsistent state regulation of DTS is not a purely legal one. Rather, underlying questions of fact pervade the determination of the scope of the Commission's statutory jurisdiction. Most obvious among these factual issues, of course, is the scope of the state regulation involved: Does the state rule attempt to deal with interstate use of DTS/DEMS or solely with intrastate aspects of the services? Even if the preempted regulation were to appear on its face to govern only intrastate service, a reviewing court would need to determine whether the particular intra-

---

28. Petitioners argue that such a definition is implicit in certain FCC statements. NARUC argues that ¶ 75 of the Order adopts, by reference to the *Competitive Carrier Rulemaking (First Report and Order),* 45 Fed.Reg. 76,148 (1980) (amending 47 C.F.R. §§ 61.15a, 61.38–61.39, 61.58(f), 63.07, 63.61, 63.71, 63.90), a policy of minimal tariff regulation for nondominant DTS carriers. As a result, NARUC asserts, the FCC

> *has* attempted to preclude the States from applying any form of rate regulation to "nondominant" *DTS–DEMS* carriers which is more stringent that (*sic*) the minimal tariff regulation prescribed in the FCC's *Competitive Carrier Rulemaking.* Thus, ... the FCC preempted the States with respect to the procedural requirements of State rate regulation of intrastate DTS service and DEMS carried by nondominant carriers, and preempted any State regulation of DTS and DEMS resellers.

NARUC Brief at 14–15; *see also* NARUC Reply Brief at 5–6. However, as NARUC itself freely concedes, "[i]n the decisions in the *Competitive Carrier Rulemaking,* the FCC did not address

the issue of corresponding State rate regulation." NARUC Brief at 14. Consequently, it remains to be seen whether the FCC will view more stringent state procedural and tariff regulations as inconsistent with the newly relaxed federal tariff requirements and will, therefore, preempt the state rules.

NARUC's further contention that the FCC adopted NARUC's construction of the interrelationship between the *Competitive Carrier Rulemaking* and the DTS Order on the basis of an example in the FCC's brief of the potentially deleterious effects of state DTS rate regulation is utterly without merit. It is well established that a passing comment in a litigation brief does not constitute a reviewable agency determination. *See* 5 U.S.C. § 553 (1982) (standards for agency rulemaking); *cf. Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) (*post hoc* litigation affidavits are inadequate basis for review of agency action).

29. *AT & T v. FCC,* 602 F.2d 401, 409 (D.C.Cir. 1979).

state feature the state seeks to regulate is separable from the interstate communications network.[30] Petitioners themselves concede that the FCC has been granted broad authority to regulate interstate use of DTS/DEMS and that the FCC *would* have authority to preempt state regulation of *nonseparable* intrastate aspects of these systems were such regulation demonstrated to present unavoidable conflict with the national interest.[31] Yet, whether a state regulation unavoidably conflicts with national interests is an issue incapable of resolution in the abstract. Still other factual questions concern the nature of the new services themselves: Is DTS/DEMS essentially an interstate or a bifurcated system? Is the system more closely analogous to the services of a local telephone exchange or to those of a radio station or a community antenna television broadcast system?[32] The presence of such fact-intensive inquiries mandates deferral of review until an actual preemption of a specific state regulation occurs.

Finally, none of the petitioners has presented any compelling reason why the court should not stay its hand until the preemption issue arises in the context of a concrete factual setting. No state regulatory scheme is, at present, endangered. The FCC has indicated that not all state regulation is subject to preemption and has expressed its willingness to consider on an individualized basis whether any state rule that might in the future be adopted is inconsistent with national policy.[33] It may well be that no state regulation will ever be preempted. Should a state adopt a rule that is found to be unduly burdensome on interstate communications services, at worse, the regulation would be preempted, at which point the FCC preempting order would present a suitable subject for judicial review.[34]

## B. *The Rural Impact Issue*

◼ Petitioners' claim that the FCC ignored the impact of voice use of DTS/DEMC systems upon telephone rates in rural areas is also unripe for review at this time. Again, the elements of general

30. When intrastate and interstate aspects of a common carrier communications system can be separated, state and federal jurisdiction may be divided along those lines. *See* 47 U.S.C. §§ 152(b), 221(b) (1976 & Supp. V 1981); *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 148, 51 S.Ct. 65, 68, 75 L.Ed. 255 (1930); *McDonnell Douglas Corp. v. General Tel. Co.*, 594 F.2d 720, 724 (9th Cir.), *cert. denied*, 444 U.S. 839, 100 S.Ct. 77, 62 L.Ed.2d 50 (1979). However, when local services are inseparable from or substantially affect interstate communications, FCC jurisdiction extends into the intrastate realm. *See Computer & Communications Indus. Ass'n v. FCC*, 693 F.2d 198, 215 (D.C.Cir. 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983); *New York Tel. Co. v. FCC*, 631 F.2d 1059, 1064–66 (2d Cir.1980); *Puerto Rico Tel. Co. v. FCC*, 553 F.2d 694, 699–700 (1st Cir.1977); *North Carolina Util. Comm'n v. FCC*, 552 F.2d 1036, 1045–48 (4th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977) (*NCUC II*); *North Carolina Util. Comm'n v. FCC*, 537 F.2d 787, 793–95 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976) (*NCUC I*).

31. *See* California Brief at 4–6; NARUC Brief at 22–23; NARUC Reply Brief at 2–3, 11–12. Petitioners' argument is that intrastate aspects of the services *are* separable and that, therefore, no threat to national interests is posed by state

regulation of intrastate aspects of DTS/DEMS. We express no opinion on the merits of this controversy.

32. *See* NARUC Brief at 17–23; FCC Brief at 23–30; NARUC Reply Brief at 8–10. In general, the Communications Act of 1934 grants to the states jurisdiction over local exchange services, *see* 47 U.S.C. § 221(b) (1976); *NCUC II*, 552 F.2d at 1046, while reserving to the FCC broad regulatory authority over radio broadcasting, *see* 47 U.S.C. §§ 152(a), 301, 303 (1976); *General Tel. Co. v. FCC*, 413 F.2d 390, 401 (D.C.Cir.) (citing *Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 279, 53 S.Ct. 627, 633, 77 L.Ed. 1166 (1933)), *cert. denied*, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969). *See also United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) (upholding FCC's assertion of jurisdiction over community antenna television systems, a technology analogous to both telephone and broadcasting services).

33. *Digital Termination Systems (Reconsideration Order)*, 90 F.C.C.2d at 333; *see supra* text accompanying note 26.

34. *See Toilet Goods Ass'n*, 387 U.S. at 165, 87 S.Ct. at 1525.

fitness of the issue for review, finality of the administrative determination, and demonstrated hardship to the parties from deferral of review are all lacking.

Petitioners' concern arises from the possibility that large corporate customers[35] might "by-pass" local telephone exchange facilities by using DTS for voice communications. Local telephone exchange carriers are compensated for the use of their exchange facilities to complete interexchange telephone calls; this compensation is based in significant part on the amount of interstate use of the local facilities.[36] Petitioners argue that DTS "by-pass" of the local telephone facilities would result in a loss of this revenue to local exchange carriers. In rural areas, where the costs of providing local services are relatively high, compensation received from the use of local exchange facilities in interstate calls may represent a substantial part of the local carrier's revenues; these revenues underwrite in part the high costs of operation in rural areas and help to keep local rates from becoming exorbitant. To the degree that it may duplicate telephone service and cause traffic and accompanying revenues to be diverted from local exchanges, voice use of DTS, petitioners assert, will threaten the provision of "communications service with adequate facilities at reasonable charges"[37] in rural areas. Petitioners further contend that the FCC arbitrarily and capriciously ignored comments raising the problem of rural impact and predicated its authorization of voice use of DTS only on data from and assumptions concerning major metropolitan areas.

Had the FCC Order actually authorized DTS service in rural areas, we might find merit in petitioners' contention that the FCC inadequately evaluated the impact of "by-pass" on rural telephone service.[38] The

---

**35.** NARUC submitted figures indicating that "'about 10% of an exchange carrier's local loop customers may be responsible for as much as 50% of the total intercity traffic originated or terminated from the exchange. Thus, a limited number of local distribution customers may still represent a substantial loss of telecommunications traffic—and revenue—from local carriers.'" NARUC Brief at 28 n. 9 (quoting *Exchange Bypass Technology (Part 2): New AT & T Services Likely to Compete with Digital Electronic Message Services by 1984,* TRENDS IN COMMUNICATIONS REGULATION, July 1982, at 4).

**36.** This allocation of revenues is known as the separations and settlements process. "Separations" refers to the attempt to allocate the costs of service between interstate and intrastate services and facilities based in primary part on the relative number of equivalent circuit miles (a function of distance and use) attributable to interstate as compared with intrastate service. *See* 47 C.F.R. § 67.1 (1982) (incorporating by reference separately published FCC Separations Manual). Any change in separations procedures may be accomplished only through a federal-state joint board proceeding. "Settlements" refers to the division of revenues derived from "long distance" service. The interstate charges collected by each originating telephone company are merged to form an interstate revenue pool. The pooled revenues are then distributed on the basis of (a) the expenses each participating company incurs in the provision of interstate services calculated according to the Separations Manual; and (b) an appropriate rate of return on each company's investment.

**37.** Section 1 of the Communications Act of 1934 sets out as the purpose of the FCC "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide ... communications service with adequate facilities at reasonable charges." 47 U.S.C. § 151 (1976).

**38.** The FCC's treatment of the issue can, at best, be described as terse. Furthermore, we note that the Commission's method in this case of offering generalized justifications of its decisions often without discussing the opposing comments received on each issue, and then appending to the Order a separate unpublished summary of comments received containing no response to any of the comments, makes it difficult for a reviewing court to determine whether the agency has truly evaluated the comments it has received. Certainly the Administrative Procedure Act's requirement that an agency "consider" the public comments received, *see* 5 U.S.C. § 553(c) (1982) ("After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."), must mean something more than a mere listing of abstracts of the comments totally unintegrated with the Order itself. *See, e.g., Rodway v. United States Dep't of Agriculture,* 514 F.2d 809, 817 (D.C.Cir.1975) (basis and purpose statement must *respond* in a reasoned manner to comments received, ex-

Order did not do so, however. Instead, the Commission made a generalized finding that allocation of spectrum for a nationwide DTS/DEMS system would advance the public interest, but left the determination of whether service by a given prospective carrier in a particular market would similarly advance the public interest to individualized licensing proceedings.[39] Thus, the FCC Order was not the agency's final determination with respect to the rural impact issue; that issue could be revived in the context of individual licensing proceedings should any DTS carrier decide to apply for authorization to serve a rural area.

The Commission's decision to defer the issue of rural impact until applications for licenses to serve rural markets may be made was not unreasonable. Consideration of the effects of DTS on every conceivable market would have been virtually impossible in the context of a single proceeding. Consequently, the Commission appropriately based its determination that the allocation of spectrum for DTS would serve the public interest upon evidence of the probable impact of the service on the markets potential carriers represented they would be most likely to serve, *i.e.,* large metropolitan areas housing a number of major corporate headquarters.[40] The record contained sufficient evidence that inherent limitations on voice use of DTS in such areas would prevent a deleterious impact on rates and services to place the Commission's decision within the zone of reasonableness.[41] Should a carrier apply to provide DTS in a rural market, the FCC would have to consider whether the assumptions on which its general rulemaking rested still apply and, if they do not, what the appropriate policy toward DTS use in that market should be. This approach has solid support in our prior cases. In *Telocator Network of America v. FCC,*[42] for example, this court found that an FCC policy favoring "open entry" into the radiotelephone market "may augur more harm than good if implemented indiscriminately in all market

plain how the agency resolved the significant problems raised by the comments, and show how that resolution led the agency to the ultimate rule); *American Medical Ass'n v. Mathews,* 429 F.Supp. 1179, 1204 (N.D.Ill.1977) (major issues must be identified and agency reaction to those issues explained).

**39.** *See Digital Termination Systems (First Report and Order),* 86 F.C.C.2d at 388–89; *see also id.* at 394–95, 398–99 (amending 47 C.F.R. §§ 21.7, 21.15 (requiring licensing applications) and adding § 21.500 (requiring applications by existing and proposed communications carriers to provide DTS services to demonstrate "that the public interest would be served by such a grant")); 47 C.F.R. § 21.3 (1982) (prohibiting use or operation of radio transmitter without authorization by FCC); *id.* § 21.13(a)(4) (requiring radio station construction permit applications to show reasons why grant of permit would serve public interest); *id.* § 21.30(a)(3) (permitting petitions to deny applications as inconsistent with the public interest); *id.* § 21.-32(a) (applications granted only after FCC finding that grant will serve the public interest).

**40.** *See Digital Termination Systems (First Report and Order),* 86 F.C.C.2d at 370 (explaining rationale for determining the number of cities an extended network must serve).

**41.** None of the commenters in the proceeding favored total prohibition of DTS voice use, apparently because incidental voice use is essential to the enhancement of other functions such as teleconferencing. Although the Commission could have prohibited other-than-incidental voice use, its decision to refrain from regulatory action on this point cannot be said to be unreasonable. As has already been noted, analog transmission is technologically better suited for voice use than is digital transmission. *See supra* note 2. Comments before the Commission indicated that the higher cost of DTS, coupled with the high demand for the limited DTS spectrum for data transmissions, rendered it unlikely that DTS would substantially displace currently available systems for voice communication. *See* J.A. 418 (comments of the National Telecommunications and Information Administration (NTIA)). Finally, even if all of the spectrum allocated for DTS were employed exclusively for voice traffic, the system would support the equivalent of "less than one percent of the possible telephone connections in New York City." *Digital Termination Systems (First Report and Order),* 86 F.C.C.2d at 384; *see* FCC Brief at 12 n. 7 (explaining printing omission creating appearance of arithmetic error in the Order's computation); *see also* J.A. 418 (comments of NTIA) (rough estimate of less than 10% of traffic in metropolitan areas).

**42.** 691 F.2d 525 (D.C.Cir.1982).

conditions."[43]   The court continued, however:

> We do not think this potential justifies invalidating the entire perpetual open entry policy; we do, however, sound the warning that in applying that policy to authorize additional carrier access to already saturated frequencies, the Commission must be sensitive to the dynamics of the particular market .... The Commission has an ongoing obligation to monitor its regulatory programs and make adjustments in light of actual experience .... *This duty to fine tune its regulatory approach as more information becomes available is necessarily the price of leeway the courts accord the Commission to pursue plans and policies bottomed on informed prediction*.... While the Commission "need not re-study the entire problem de novo and reconsider the policy every time it receives an application for waiver of the rule," ... it cannot bind itself to the exigencies of the truly exceptional case.[44]

If and when the FCC grants a DTS license in a rural area over the objection of interested parties, a challenge based on the adverse impact of voice use of DEMS/DTS on that market will be ripe for judicial review. Consideration of the issue in such a context will give the court the benefit of facts not available in this proceeding[45] without imposing undue hardship on the parties in this case.

**43.** *Id.* at 550.

**44.** *Id.* at 550 & n. 191 (quoting *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C.Cir.1969); *see also Lincoln Tel. & Tel. Co. v. FCC*, 659 F.2d 1092, 1100–02 (D.C.Cir.1981); *AT & T v. FCC*, 539 F.2d 767, 774–75 (D.C.Cir.1976); *Washington Utils. & Transp. Comm'n v. FCC*, 513 F.2d 1142, 1160–65 (9th Cir.1975).

**45.** Such facts might include, for example, the cost of providing local telephone service in that market, the number of interstate originations or terminations that DTS might reasonably be expected to deflect from existing carriers, the probable resultant loss of interstate revenues to those carriers, the anticipated effect of that loss upon local rates and services, and any countervailing benefits that DTS might offer to the public in the relevant service area.

## C.  The Alaska Policy Issue

Closely related to the rural impact issue is Alascom's challenge of the FCC's refusal to exclude Alaska from the purview of the DTS proceedings.  Because of the extraordinarily high cost of providing service to Native American villages scattered throughout the state's sparsely populated "bush" regions, Alascom is heavily dependent upon revenues obtained through the settlement process.[46]  Alascom argued that the Commission had in the past deferred to these circumstances by limiting entry in Alaska by competing carriers and asked the Commission to continue this policy by excluding Alaska from the DEMS/DTS proceeding.

The FCC responded by noting that as early as 1970, shortly after Alascom's parent, RCA Global Communications, Inc., purchased the Alaska Communication System from its previous operator, the United States Air Force, the Commission indicated that it did not intend to perpetuate a protected monopoly status for the Alaska system but would judge each application for service on its own merits.[47]  In recent years, the Commission contends, it has moved progressively toward treating Alaska in the same manner as it treats the 48 contiguous states.  Consequently, the agency refused the invitation to exclude Alaska from the DTS proceeding.[48]

As previously noted, the DTS Order did not authorize DEMS/DTS service in Alaska

**46.** Alascom's comments indicated that the investment in service to the bush averaged $110,884 of plant in service per telephone in 1978 as compared to the Bell system's plant in service per telephone average of $756 in 1977.  The 1979 interstate and intrastate toll revenue requirement per telephone was estimated at $43,777 per year to maintain the Alaskan bush service. *See* J.A. 231–34.  Consequently, Alascom's reliance "on the interstate revenue pool for support ... was more than 150% of revenues." Alascom Brief at 21.

**47.** *RCA Alaska Communications, Inc.,* 22 F.C.C.2d 200, 204 (1970).

**48.** *Digital Termination Systems (First Report and Order),* 86 F.C.C.2d at 391.

or elsewhere; rather, determination of the benefits and detriments of service in particular markets was left to individual licensing proceedings.[49] For the same reasons that lead us to hold that the rural impact issue is not yet ripe for review, we decline to consider the merits of Alascom's petition.

Although Alascom has provided some factual information relevant to the effects of "by-pass" in Alaska, other necessary facts remain to be developed. We are supplied, for example, with statistical data concerning the cost of bush service and Alascom's dependence on interstate settlements. But because we have no information concerning the proportion of interstate service that DTS/DEMS systems would be likely to displace, it is impossible to assess the probable economic impact on carriers presently serving Alaska. Potential DEMS/DTS carriers have had no chance to demonstrate how their services might benefit the Alaskan public, nor has the FCC been given the opportunity to alleviate any possible detriment to Alascom and other Alaska carriers by adopting special rules for Alaskan DTS carriage after full development of these and other facts in the context of a licensing hearing.[50]

Nevertheless, Alascom appears to argue that postponing review will inflict undue hardship, because the burden of proof with respect to the public interest ramifications of a DTS application may be shifted if the Commission's Order is permitted to stand.[51] This allegation of hardship, however, is clearly inadequate to render the Alaska entry issue ripe for review. The

FCC has indicated its willingness to consider "[t]he impact of DEMS on basic telephone service in Alaska ... in the context of a particular application to initiate the service there, provided that a sufficient showing of *unusual circumstances* is made that would warrant a departure from the general public interest finding."[52] The Commission's general public interest finding was grounded on two assumptions: (1) DEMS/DTS will not substantially overlap service provided by existing carriers; and (2) to the extent there *is* overlap, it will be insignificant, at least in major metropolitan areas. If, as Alascom contends, Alaskan service conditions differ so substantially from those in metropolitan areas that these assumptions do not bear true for Alaska, a showing of "unusual circumstances" should not be difficult to provide.

Moreover, FCC regulations do not, as Alascom seems to suggest, place the entire burden of proving public interest benefit upon a license applicant. To be sure, each application must "[s]tate specifically the reasons why a grant of the proposal would serve the public interest, convenience, and necessity,"[53] but even absent a generalized finding of public interest benefit in a previous rulemaking, petitions to deny a license must "[c]ontain specific allegations of fact ... supported by affidavit of a person or persons with personal knowledge thereof, ... which shall be *sufficient to demonstrate ... that a grant of ... the application would be prima facie inconsistent with the public interest.*"[54] If a "substantial

**49.** In comments filed with the FCC in connection with the Commission's reconsideration of DTS technical issues, Alascom stated that it was "satisfied that the practice of considering the issues raised by Alaskan service when applications proposing such service are filed will allow the Commission to exercise its statutory responsibilities under Sections 214 and 309 of the Communications Act, discussed in our comments in the [DTS] proceeding." J.A. 696. Alascom indicated that its concern was with the *manner* in which such applications might be evaluated, a matter which is obviously not fit for review until an objectionable evaluation has been rendered.

**50.** We note also the FCC's argument that Alascom might even lack standing to challenge DTS authorizations because the local exchange carriers, not Alascom, will be aggrieved if "bypass" presents a substantial problem. *See* FCC Brief at 46 n. 45.

**51.** Alascom Reply Brief at 4–8.

**52.** FCC Brief at 46–47 (emphasis supplied).

**53.** 47 C.F.R. § 21.13(a)(4) (1982).

**54.** 47 C.F.R. § 21.30(a)(3) (1982) (emphasis supplied).

and material issue of fact is presented," [55] the Commission must conduct a formal hearing on the license request; the application may be granted only on a finding that "the public interest, convenience, and necessity" will be served thereby.[56] Thus, the burden of proof is normally divided between parties supporting and opposing the grant. The nominal additional burden of coming forward with an initial showing that the assumptions undergirding the Commission's generalized findings do not apply to Alaska is too inconsequential a hardship to warrant a rush to review.

### III. Conclusion

For the foregoing reasons, the petitions for review are dismissed. Petitioners' challenges will be preserved for the court's review (1) when there is an actual state regulation in place which the FCC declares invalid as inconsistent with FCC regulation; or (2) when FCC grants a DEMS application over the objection of Alascom or another rural carrier.

*So ordered.*