734 F.2d 1541
 236 U.S.App.D.C. 258
 SOUTH CAROLINA ELECTRIC & GAS COMPANY, Carolina Power &
Light Company, Duke Power Company, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
EDISON ELECTRIC INSTITUTE, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Association of American Railroads, Western Coal Traffic
League, Intervenors.
 Nos. 83-1384, 83-1410.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 15, 1984.
Decided May 8, 1984.
 
 Petitions for Review of an Order of the Interstate Commerce commission.
 John F. Donelan, Jr., Washington D.C., with whom Frederic L. Wood, John F. Donelan, Harry H. Voigt and Leonard M. Trosten and Michael F. McBride, Washington, D.C., were on the brief, for petitioners in Nos. 83-1384 and 83-1410.
 Craig M. Keats, I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, I.C.C., J. Paul McGrath, Asst. Atty. Gen., Barry Grossman and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents in Nos. 83-1384 and 83-1410.
 Kenneth P. Kolson, Washington, D.C., with whom Richard B. Allen, Chicago, Ill., Robert B. Batchelder, Omaha, Neb., Emried D. Cole, Jr., Louisville, Ky., James L. Howe, III, Richmond, Va., Milton E. Nelson, Chicago, Ill., Hanford O'Hara, and J. Thomas Tidd, Washington, D.C., were on the brief for intervenor, Association of American Railroads in No. 83-1410.
 William L. Slover and C. Michael Loftus, Washington, D.C., entered appearances for intervenor, Western Coal Traffic League in No. 83-1410.
 Before BORK and SCALIA, Circuit Judges, and SWYGERT,* Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit.
 Opinion for the Court filed by Circuit Judge SCALIA.
 SCALIA, Circuit Judge:
 
 
 1
 In 1978 the Interstate Commerce Commission ("ICC") proposed a study to consider adopting depreciation accounting for the "track structures" accounts of regulated railroads. Track structures include rails, ties, ballast and related materials, and the labor and overhead costs of installing or removing them. The study led to a rulemaking proceeding, which in 1983 produced a final order directing the railroads to adopt depreciation accounting for track structures, and in connection with that change to restate existing track structure accounts, for reporting purposes, at the cost of their most recent replacement. Alternative Methods of Accounting for Railroad Track Structures, 367 I.C.C. 157 (1983). Petitioners support the change to depreciation accounting, but challenge the requirement for restatement of track accounts. In our view the only issue that need be resolved is whether this dispute is ripe for review.
 
 
 2
 * For many years, the ICC directed railroads to maintain their track structures accounts according to the retirement-replacement-betterment method of accounting ("RRB" or "betterment" accounting). Under this method, the original capital investment in track structures, including labor costs, was capitalized as an asset but was not depreciated. Instead, the labor and material costs of subsequent replacements were charged to expense in the year incurred. Betterments, that is, the replacement of track structures with material of a superior quality, were not treated the same as replacements. The added cost of the superior material over the cost of replacing the material removed was added to the (nondepreciable) asset base, while labor costs were expensed in the period in which the betterment was undertaken. The track structure would be carried on the books at its original cost, plus betterment material cost, until abandonment, when the totality would be recovered by charging it as an expense against current earnings. Although betterment accounting had theoretical appeal as a systemwide method of recovering costs, it allowed railroads to manipulate their earnings. In profitable years they could increase their track replacements and, by fully expensing the cost, decrease their earnings. Conversely, they could defer maintenance in unprofitable years and make their financial statement (which did not include depreciation of track structures) appear more profitable than reality would justify.
 
 
 3
 Depreciation accounting provides for a steady recovery of the cost of an investment over its useful life. The cost of an asset is capitalized in the year in which the investment is made, and a portion of that cost over the asset's salvage value is charged to expense for each period in the asset's life. This system is less subject to manipulation and allows the railroad to recover the costs of an asset in regular increments over its life, rather than only when it is replaced.
 
 
 4
 The differences between these systems of accounting can be seen in the following examples, used by the Commission in its opinion. See Alternative Methods of Accounting for Railroad Track Structures, 367 I.C.C. 157, 174-75 (1983) ("Commission opinion"). In an inflation-free world, had a railroad using RRB accounting installed track with a twenty-year life at the cost of $100 in 1960, and replaced it in 1980 with track of identical quality at the same cost, it would have listed the asset at a book value of $100 in 1960, and would have taken a $100 expense in 1980, continuing to value the asset at $100 on its books. Had the railroad used depreciation accounting, it would have taken a $5 depreciation expense annually until 1980, when the book value of the asset would have been written down to zero (assuming no salvage value), and it would then have increased the book value to $100 again with the 1980 investment. Although the two methods distribute the cost of the investment differently over the assets's life, a not insubstantial difference, they both allow the railroad to recover the $100 cost of the original investment and to carry the new asset at its initial cost. Inflation, however, complicates the accounting problem. Had the RRB railroad replaced its 1960 track in 1980 with track of identical quality but at the inflated price of $200, it would have taken a $200 expense in 1980, and would have carried the asset on its books at the old value of $100. The depreciation accounting railroad would have valued the newly purchased track on its books at $200, and taken $10 annual depreciation expenses over its useful life.
 
 
 5
 In soliciting comments about the merits of replacing RRB accounting with depreciation accounting, the ICC also sought comments on whether existing track structures accounts should be restated in order to implement the new system. Notice of Proposed Rulemaking, 46 Fed.Reg. 32,289, 32,291-92 (1981); Supplemental Notice of Proposed Rulemaking, 47 Fed.Reg. 11,539, 11,540-41 (1982). The petitioners filed comments opposing this idea, while the railroads supported it. See Commission opinion at 173-74. In the order under review, the Commission directed the railroads, in changing from RRB to depreciation accounting, to restate the value of their assets; track structures previously carried on the railroads' books at initial cost were to be restated at the cost of the most recent replacement, depreciated from that higher figure. To use the figures presented above, a railroad adopting depreciation accounting in 1983 (the first year the ICC ordered reports using depreciation accounting to be prepared) would restate the value of an asset historically carried at $100 to $170 ($200 minus three years of annual depreciation of $10).[1]
 
 
 6
 The petitioners assert that the result of this system is impermissible double counting. They argue that it allows railroads that have already expensed the most recent replacement cost under RRB to recoup the same cost again, as depreciation in future years. Again returning to the Commission's example, a railroad that has made a total of $300 in track investment ($100 in 1960, $200 in 1980) can take a total of $370 in expenses ($200 in 1980 under RRB, $170 over the period of 1983-1999 under depreciation accounting). Under the old RRB system the railroad would only have recovered its actual costs ($200 in 1980, any future replacement costs, and $100 upon line abandonment).
 
 
 7
 The Commission and intervenor railroads argue that sound accounting practice requires depreciation to be computed on the basis of historical cost, which in the case of replaced track structure is the actual cost of replacement. Any distortion, they claim, is the consequence of the prior RRB system rather than of the new depreciation proposal. They assert, moreover, that RRB never was, and never was meant to be, an accurate reflection of structure-by-structure costs, but was thought to present an approximation of overall costs only when applied to the system as a whole, whereby the annually expensed replacement costs of a relatively few track structures would approximate the overall depreciation of the system as a whole. Applying depreciation accounting as petitioners desire would, they argue, produce for the future a hybrid of two distorted systems: depreciation based on inaccurate costs, and RRB without the original ability to expense replacements. They claim that, system-wide, double counting can only occur if a railroad reduces its track replacement costs to less than the level of its depreciation charges, which would mean allowing track condition to deteriorate. Finally, they note that even structure-by-structure the restatement system would not always overcount.[2]
 
 II
 
 8
 We do not reach the merits of this dispute, since we agree with the preliminary argument of respondent and intervenor that the order is not ripe for judicial review. The purpose of the doctrine of ripeness in the context of reviewing agency action is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967). In at least some of its applications, this doctrine is part of the "case or controversy" requirement of the Constitution, see Regional Rail Reorganization Act Cases, 419 U.S. 102, 138, 95 S.Ct. 335, 356, 42 L.Ed.2d 320 (1974). The Supreme Court has established a two-part test of ripeness, noting that it depends on "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, supra, 387 U.S. at 149, 87 S.Ct. at 1515. The latter portion of the test is not met here.
 
 
 9
 The requisite "hardship" may exist if an agency rule, although not yet enforced against the complainant, compels the complainant to choose between compliance, at some present cost, and failure to comply, at the risk of legal penalty. That was the situation in Abbott Laboratories, where the petitioners were forced to choose between expensive compliance with agency action they thought unlawful and the severe consequences of violating the agency's rules. That was not the situation in Abbott Laboratories' companion case, Toilet Goods Association, Inc. v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), where the Court found that no "irremediable adverse consequences flow from requiring a later challenge." Id. at 164, 87 S.Ct. at 1525. See also National Association of Regulatory Utility Commissioners v. FCC, 727 F.2d 1212 (D.C.Cir.1984); Air New Zealand Ltd. v. CAB, 726 F.2d 832 (D.C.Cir.1984).
 
 
 10
 The same is true here. Not only is the present action of the Commission not an enforcement action directed against these petitioners, but even the general rule in question does not compel or call into question any primary conduct in which petitioners engage. The depreciation accounting rules compel action only on the part of the railroads who have been ordered by the Commission to maintain double books--both RRB and depreciation accounting figures--"until inflation procedures are adopted." Commission opinion at 184.[3] This may constitute a present hardship to the railroads (who do not complain of it) but not to these petitioners, who are called on to do nothing. As was the case in Toilet Goods, supra, we cannot say that "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs." The order affects no "primary conduct" and "no irremediable adverse consequences flow from requiring a later challenge." 387 U.S. at 164, 87 S.Ct. at 1525. In all relevant respects, this rule is equivalent to the interpretive order of the Commission which we declined to review, on ripeness grounds, in Baltimore Gas & Electric v. ICC, 672 F.2d 146 (D.C.Cir.1982). See also Arkansas Power & Light Co. v. ICC, 725 F.2d 716 (D.C.Cir.1984).
 
 
 11
 At oral argument the petitioners cited the Commission's recent decision in Eli Lilly & Co. v. Burlington Northern R.R., No. 38262 S (Feb. 1, 1984), to prove that depreciation accounting was currently being used in rate-making. In Eli Lilly the Commission found that Lilly had failed to carry its burden of showing that Burlington Northern's charges exceeded the maximum reasonable rate. In the appendix to its decision, the Commission presented two sets of cost figures, one based on RRB, the other on depreciation accounting. The Commission noted that the depreciation accounting figures, developed by its Bureau of Accounts' Section of Accounting and Reporting, were "not ... a matter of record," and were set forth "[i]n an effort to provide additional meaningful data to be considered in establishing a reasonable rate." Id. at appendix p. 1.
 
 
 12
 This submission does not satisfy us that the petitioners' case is ripe. If Eli Lilly constitutes an actual dispositive use of depreciation accounting (which is doubtful), the practice can be challenged in an appeal from that ratemaking--by Lilly, whose primary conduct (the paying of rates) will have been affected by the ratemaking order. That would still not establish any present effect of the instant rule upon the primary conduct of these petitioners. The test of ripeness is not whether a rule has actually been adopted and is seriously meant to be enforced; but whether the threat of its enforcement reasonably affects the conduct of these petitioners, here and now. In their briefs, and in response to the court's inquiry at oral argument, petitioners set forth no such effect.
 
 
 13
 Subsequent to oral argument, in a letter providing the court with a copy of the Eli Lilly decision, petitioners' counsel asserted that the existence of the Commission's order will affect "the course of contract rate negotiations currently underway between utility companies and the railroads." Letter of Mar. 20, 1984 at 2. It seems to us highly implausible that the existence of this rule will affect petitioners' conduct in the negotiations--causing them to bargain for higher rates that they believe unlawful. They are free to assert the unlawfulness in the negotiations, as they have here, and (unlike the petitioner in Abbott Laboratories ) will suffer no penalty for taking that position. In any case, we do not believe that this argument, to which respondent and intervenor have had no opportunity to reply, is properly before us. We are troubled by this attempt of petitioners' counsel--and they are not alone before this court in the use of this strategy--to supplement their argument. The Federal Rules of Appellate Procedure allow parties to bring new authorities to the attention of the court, but the rule specifies that such submissions "shall without argument state the reasons for the supplemental citations." Fed.R.App.P. 28(j) (emphasis added). Although the boundary between stating the reasons for a citation and argument may be hard to police, we think the present point does not explain the relevance of Eli Lilly and is an impermissible attempt to supplement oral argument.
 
 
 14
 * * *
 
 
 15
 The ways of the courts are not the ways of administrative agencies, or at least not the ways of all administrative action. Evaluation of a general rule in abstraction from a specific instance of its application is quite different from the adjudication of concrete, particularized controversies which is the traditional business of the courts, and to some degree the only permissible business of federal courts under the "case or controversy" provision of the Constitution. The Supreme Court has reconciled our judicial traditions and constitutional limitations with the realities of modern governmental practice by entertaining challenges to rules--even challenges that arise in a relatively abstract and unparticularized context--when the mere existence of those rules exerts an immediate and palpable effect upon private rights. Since that situation does not exist here, we defer ruling upon the merits of this controversy until they can be presented to us in a more concrete form, in which we can examine the effects of this agency's action upon a real-life situation, instead of considering only the hypotheticals that have formed the basis of our earlier discussion. At that later time, we may be able to consider not merely the restatement rule in the abstract, but the specific form of restatement that may be the product of the Commission's pending proceeding regarding inflation accounting--which is so closely allied to the present rule that the Commission has declined to implement the latter separately. It may also be that, in the course of its inflation accounting proceeding or otherwise, the agency may decide to consider altering its course, which is yet another reason to abstain from intervention where delay produces no "hardship" to those seeking review.
 
 
 16
 Petition denied.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 The Commission maintains, and the petitioners agree, that although the change to this method may in part have been motivated by the distorting effect of inflation upon RRB accounting, asset values are still based on historical cost. The difference is that they are now based on the most recent historical cost rather than the oldest. Any change to a system of replacement-cost accounting (not based on historical cost) will be made in a later rulemaking. See note 3, infra
 
 
 [2]
 If, for example, track was replaced at the cost of $200 in 1965, by 1983 it would only have two years of useful life remaining and the railroad would be able to recover only a total of $220 ($200 expensed under RRB in 1965 and $10 per year depreciation in 1983 & 1984) on its $300 total investment. Petitioners respond to this argument by noting that because of recent inflation, the net systemwide effect of restatement would be to overcount; and that regardless of whether restatement results in overcounting or undercounting, it is accurate only by accident
 
 
 [3]
 "Inflation accounting" is now under consideration by the Commission in Ex Parte 393 Sub-1, Proposed Revision to Existing Standards for Determination of Revenue Adequacy of Railroads, 48 Fed.Reg. 10,144 (1983). Such a system would revalue assets for depreciation purposes on some basis related to their current value rather than their historical cost