738 F.2d 1322
 238 U.S.App.D.C. 176
 MCI CELLULAR TELEPHONE COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Bell Atlantic Mobile Systems of Pittsburgh, Inc., Gencom,
Inc., ARTS/Post D.C. Cellular Systems & ARTS/Post
Maryland Cellular Systems, GTE Mobilnet,
Inc., Intervenors.
GENCOM, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
New Vector Communications, Inc., GET Mobilnet, Inc., Intervenors.
 Nos. 83-1408, 83-1720.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 24, 1984.
Decided June 29, 1984.
 
 Appeals from an Order of the Federal Communications commission.
 John M. Pelkey, Washington, D.C., with whom Michael H. Bader, Kenneth A. Cox and Richard B. Severy, Washington, D.C., were on the brief for appellant, MCI Cellular Tel. Co. in No. 83-1408. Ruth Baker-Battist, Washington, D.C., also entered an appearance for MCI Cellular Tel. Co.
 Jack N. Goodman, Washington, D.C., with whom W. Theodore Pierson, Jr., Robert Trager and Jack R. Smith, Washington, D.C., were on the brief for Gencom, Inc., appellant in No. 83-1720 and intervenor in No. 83-1408.
 Michael Deuel Sullivan, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C. Washington, D.C., were on the brief, for appellee in Nos. 83-1408 and 83-1720.
 David W. Carpenter, Chicago, Ill., with whom Alan C. Geolot, Washington, D.C., was on the brief for intervenors, Bell Atlantic Mobile Systems of Pittsburgh, Inc. and NewVector Communications, Inc. in Nos. 83-1408 and 83-1720. Benjamin W. Heineman, Jr., Washington, D.C., and Robert A. Geilich, New York City, also entered appearances for Bell Atlantic Mobile Systems of Pittsburgh, Inc. and NewVector Communications, Inc.
 James R. Hobson, Washington, D.C., was on the brief for intervenor, GTE Mobilnet, Inc., in Nos. 83-1408 and 83-1720. Gail L. Polivy, Washington, D.C., also entered an appearance for GTE Mobilnet, Inc.
 Jeremiah Courtney, Jack R. Smith and Robert H. Schwaninger, Washington, D.C., were on the brief for intervenor, ARTS/Post D.C. Cellular Systems, et al. in No. 83-1408.
 Before WILKEY, STARR and DAVIS*, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STARR.
 STARR, Circuit Judge:
 
 
 1
 This case ushers the court once again into the burgeoning field of cellular telephone service. As we will see in greater detail below, two types of communications common carriers can provide such services: wireline carriers, namely, local telephone companies and their affiliates, and non-wireline carriers, consisting of virtually everyone else in the industry such as the petitioners here. The principal question presented by these consolidated petitions for review is whether the Federal Communications Commission may, in the face of challenges by non-wireline carriers, defer consideration of whether to impose a moratorium on the provision of cellular telephone service by a wireline carrier until that carrier applies for an operating license.
 
 
 2
 MCI Cellular Telephone Co. ("MCI") and Gencom, Inc. ("Gencom"), non-wireline carriers, argue that, by virtue of competitive considerations, the FCC must determine whether a moratorium is required at the time when a wireline carrier applies for a construction permit to build cellular facilities. We decline, however, to read the governing statute in the inflexible manner advanced by MCI and Gencom. Accordingly, for the reasons which follow, we uphold the FCC's deferral of the moratorium question as a reasonable procedure promotive of both administrative economy and swifter availability of cellular services to consumers. Because we uphold the FCC's deferral of the moratorium question, we reject as premature petitioners' contentions with respect to the method by which the FCC will determine whether a moratorium will be mandated.
 
 
 3
 We also uphold the FCC's deferral of the determination whether a local telephone company is providing reasonable interconnection to non-wireline carriers until such time as the wireline carrier applies for an operating license. Finally, we reject MCI's separate contentions (1) that the wireline carrier in the Pittsburgh market has failed to disclose the manner in which it plans to interconnect with the telephone network and (2) that the wireline carrier, an AT & T subsidiary at the time of MCI's petition, has failed to demonstrate its financial qualifications to provide cellular telephone service. We therefore deny in their entirety both MCI's and Gencom's petitions for review.
 
 
 4
 * A
 
 
 5
 This case concerns the FCC's regulation of "cellular land mobile radio systems," more popularly known as cellular telephone service. For those unsteeped in this technology, suffice it to say that land mobile service is a system in which one station is mobile (either portable or in a car) and the other station is either a normal telephone or another mobile unit. Conventional land mobile services use a single high-power transmitter in a given metropolitan area and possess a maximum capacity of 44 channels. By contrast, cellular radio, on which cellular telephone service is based, divides a metropolitan area into several "cells." In each cell a low-power transmitter carries up to 666 channels. As a telephone-equipped automobile or other vehicle travels from one cell to another, the transmission of the conversation is shifted from one transmitter to another. By virtue of the greater number of channels and the ability to shift transmissions, cellular radio enjoys enormous advantages in both capacity and signal quality over conventional systems.
 
 
 6
 In 1974, the FCC allotted 40 MHz (on the 900 MHz band) for the development of cellular service. See Land Mobile Radio Service, 46 F.C.C.2d 752 (1974), on reconsideration, 51 F.C.C.2d 945, clarified, 55 F.C.C.2d 771 (1975). The FCC's order on reconsideration allowed both wireline carriers and non-wireline carriers to compete for the exclusive license to provide cellular service in a given metropolitan area. 51 F.C.C.2d at 953. At the same time, the Commission expressed the opinion that only wireline carriers would have the resources and expertise requisite to licensing. Id. The necessary consequence of this clear competitive edge was that non-wireline carriers, such as petitioners here, would not likely succeed in competing against wireline carriers for the exclusive license in a particular metropolitan area.
 
 
 7
 On petition for review of the FCC's order, this court in a comprehensive opinion upheld the proposed regulatory structure despite reservations about its possible anticompetitive effects. See National Association of Regulatory Utility Commissioners v. FCC, 525 F.2d 630 (D.C.Cir.), cert. denied, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). In NARUC, this court prophesied that "there is good reason to believe that AT & T will operate most, if not all, of the cellular systems put into operation," id. at 636, but concluded that "[t]he serious anticompetitive effects, if they arise at all, will do so only after full implementation begins." Id. at 638. The court's affirmance, however, contained "the implicit recognition" that [the FCC's licensing structure for cellular telephone service] "may be subject to successful challenge at some future date." Id. at 639.
 
 
 8
 In 1981, five years after NARUC, the FCC began full implementation of cellular service. Heeding the anticompetitive concerns expressed in NARUC, the Commission fundamentally altered the allocation structure by dividing the 40 MHz spectrum into two portions. This subdivision permitted two cellular licenses per market area, each covering 20 MHz blocks. See Cellular Communications Systems, 86 F.C.C.2d 469 (1981), on reconsideration, 89 F.C.C.2d 58, on further reconsideration, 90 F.C.C.2d 571 (1982). One of the 20 MHz blocks in each geographical market is reserved for wireline carriers, the other for non-wireline carriers. The FCC's implementation order contemplated comparative hearings where necessary for both the wireline carrier and non-wireline carrier licenses, but the Commission candidly recognized that in many locales only one "qualified" applicant (a subsidiary or affiliate of the local telephone company) would seek the wireline carrier license. 89 F.C.C.2d at 86; 86 F.C.C.2d at 490.
 
 
 9
 This division of the spectrum into two allocation pools would, the Commission concluded, be considerably more competitive than the original allocative structure, since two classes of carriers would thereby compete for customers in every market. Reconsideration, 89 F.C.C.2d at 73. The FCC acknowledged, however, that the automatic set-aside of 20 MHz for wireline carriers could still have anticompetitive effects. Two reasons for this residual anticompetitive impact were identified. First, the market dominance of AT & T's operating companies virtually guaranteed them wireline carrier licenses in numerous markets.[1] Second, and more relevantly for our purposes, the lack of wireline carrier competition would make it more likely that the wireline carrier could institute cellular operations before the non-wireline carrier could be licensed. The FCC nonetheless concluded that the harm to the public interest engendered by the wireline carrier's "head start" was outweighed by the need to provide cellular service to the public as quickly as possible. Id. at 74 (concluding "that any [competitive] advantages stemming from early entry into the market would not be sufficiently serious to outweigh the nation's critical need for additional two-way service ...").
 
 
 10
 In light of these considerations, the FCC fashioned certain policies to mitigate the possible anticompetitive effects in its modified allocative structure. As an initial matter, the Commission recognized that, despite its general determination that the earliest possible initiation of service was desirable, the early entry of a wireline carrier in a particular market might not in fact be compatible with the public interest. The FCC therefore determined that an opportunity should be afforded to a non-wireline carrier to demonstrate that the public interest would be served by a brief moratorium on initiation of wireline service. The Commission warned, however, that "general unsupported allegations of harm will not be sufficient to delay service to the public." 86 F.C.C.2d at 491 n. 87.
 
 
 11
 On reconsideration, the FCC affirmed this policy of granting selective moratoriums--a policy now known as the "head start" doctrine--in the face of arguments favoring a general rule prohibiting wireline carriers from initiating service ahead of non-wireline carriers. The Commission emphasized that the party requesting a moratorium in an individual market would bear a "heavy burden of demonstrating that such action would be in the public interest." Reconsideration, 89 F.C.C.2d at 75 n. 32. Moreover, any such moratorium, if granted, was not to be open-ended. The Commission expressly determined that the moratorium would "in no instance ... exceed six months, in order to insure that the initiation of cellular service would not be delayed." Id.
 
 
 12
 Moreover, to ameliorate the effects of the wireline carriers' head start, the FCC prohibited the wireline carriers from imposing resale restrictions on its cellular service.[2] The Commission noted that insofar as a non-wireline carrier "establish[es] a market presence as a reseller of service as soon as the wireline carrier begins operations," it reduces "the potential anticompetitive" effects of "early wireline entry." Id. at 74-75 n. 31.
 
 
 13
 The FCC also recognized that yet another kind of anticompetitive difficulty existed by virtue of the fact that wireline carriers, drawn for the most part from local telephone companies, would operate the telephone network to which the cellular systems would be required to interconnect. The Commission thus decided to ensure that non-wireline carriers' cellular systems were connected to the telephone network on terms that would provide the most favorable service for cellular telephone users. 86 F.C.C.2d at 495. The Commission's "interconnection policy" therefore required, first, that the non-wireline carrier receive at minimum an interconnection equivalent to that enjoyed by the wireline licensee and, second, that the non-wireline carrier which chose not to utilize the interconnection arrangement employed by the wireline system would nonetheless receive a "reasonable" alternate form of interconnection. 86 F.C.C.2d at 496; Reconsideration, 89 F.C.C.2d at 81.[3]
 
 
 14
 To prevent cross-subsidization of cellular and regular telephone services, the FCC required that AT & T cellular operations be carried out by a fully separate subsidiary with separate facilities, offices, operating personnel, and books of account. 47 C.F.R. Sec. 22.901(b)-(d) (1983), Reconsideration, 89 F.C.C.2d at 77-80, 99-100, modifying 86 F.C.C.2d at 493. Finally, all applicants, whether wireline or non-wireline carriers, were and are required to demonstrate that they are financially qualified both to construct their facilities and then to operate them for one year. 47 C.F.R. Sec. 22.917; Reconsideration, 89 F.C.C.2d at 86 n. 43, 104-105.
 
 
 15
 A number of parties, including the Department of Justice, judicially challenged the FCC's new implementation scheme. These petitions attacked the Commission's conclusion that the immediate need for cellular telephone service outweighed the anticompetitive effects of providing AT & T with a clear head start in most major markets. Although MCI and Gencom had filed applications with the FCC pursuant to the policies adopted in the rulemaking, neither applicant sought to participate in the petitions for review either by filing their own petitions or intervening in cases filed by others. The petitions for review were consolidated, but were later voluntarily dismissed by the petitioners in that proceeding. See United States v. FCC, No. 82-1526 (D.C.Cir. Mar. 3, 1983).
 
 B
 
 16
 High levels of interest have been shown in the developing cellular market. On June 7, 1982, cellular applications were filed for the thirty largest markets in the United States. A total of 52 wireline applications and 141 non-wireline applications were filed for those thirty markets. In subsequent rounds of filings for smaller markets, hundreds of applications have been filed.
 
 
 17
 The present controversies involve the Pittsburgh and Phoenix markets. MCI and Gencom, both non-wireline carriers, are petitioning to review the FCC's decision to grant a license to construct cellular facilities in both those markets to Advanced Mobile Phone Service, Inc. ("AMPS"), an AT & T subsidiary.[4]
 
 
 18
 * In the Phoenix market, the FCC received three applications for the non-wireline allocation, including from Gencom. The only applicant for the wireline license was AMPS. None of the non-wireline carrier applicants immediately moved to deny AMPS' application for a construction permit. Gencom, however, wrote the FCC, noting that "the Commission [had] not specif[ied] the timing or procedures" for filing petitions seeking a moratorium of wireline service under its announced "head start" policy. Gencom suggested that the Commission delay consideration of the head start question until a later time "when AMPS is closer to actual operation and the extent of competitive delay ... [is] more discernible." Phoenix J.A. 19-20. Three months later, however, Gencom filed a petition requesting the Commission to defer ruling on AMPS' construction permit application until the head start issue was resolved. Along with this petition, Gencom submitted a marketing study and an economic analysis that, in its view, substantiated the anticompetitive effects of an AMPS head start in the Phoenix market.
 
 
 19
 The FCC Common Carrier Bureau denied Gencom's petition and granted AMPS' application for a permit to construct cellular stations in Phoenix. Advanced Mobile Phone Service, FCC No. 83-50 (Jan. 31, 1983), 53 R.R.2d 12 ("Phoenix Order"). Relying on the Commission's 1982 order in Advanced Mobile Phone Service, 91 F.C.C.2d 512, 518-19 (1982) ("Chicago Order"), the Bureau found it "premature to rule" on the non-wireline carrier petitions for head start protection. The Chicago Order, it should be noted, had articulated in the previous year the FCC's policy of refusing to consider requests for head start protection at the construction permit stage and deferring such requests until the operating license stage. The Commission explained its rationale there as follows:
 
 
 20
 We are not yet in a position to know who will be awarded a license for the non-wireline block of cellular frequencies in this market and thus to assess what, if any, injury to the public interest will occur as a result of [the wireline carrier's] beginning to provide service before its non-wireline competitor.
 
 
 21
 91 F.C.C.2d at 518.
 
 
 22
 Faced with this blow, Gencom filed with the full Commission, without success, an application for review and a motion for stay of the Bureau decision. Upon this rebuff, Gencom petitioned for review in this court, arguing (1) that the Commission could not properly postpone consideration of the impact of AMPS' head start until AMPS seeks an operating license; (2) that resale of AMPS' cellular telephone services by non-wireline carriers would not ameliorate the adverse impact of an AMPS head start; and (3) that the Commission incorrectly placed the burden of proof on the non-wireline carrier objecting to the wireline carrier's head start.
 
 2
 
 23
 In Pittsburgh, as in Phoenix, the FCC received a solitary AMPS application for the wireline allocation, but three competing applications for the non-wireline allocation. Among the non-wireline applicants was MCI. In the Pittsburgh proceeding, MCI, unlike Gencom in the Phoenix proceeding, filed a petition to dismiss or deny AMPS' application for a construction permit. Setting forth several grounds for its objection, MCI argued, first, that the entire policy of separate allocation for wireline and non-wireline carriers was anticompetitive and thus contrary to the public interest. MCI contended, secondly, that AMPS had not described in sufficient detail its plans to interconnect with the telephone network and thus had not satisfied the Commission's requirement with respect to assuring equality of interconnection. Furthermore, MCI maintained that the local telephone company was not satisfying the requirement to provide other reasonable forms of interconnection, inasmuch as that company (Pittsburgh Bell)[5] was not willing to treat MCI as a class 5 office.[6] Finally, MCI alleged that AMPS, although a wholly owned subsidiary of AT & T, had not demonstrated its financial qualifications to provide cellular telephone service in Pittsburgh.
 
 
 24
 In its order of December 1, 1982, the Common Carrier Bureau dismissed MCI's petition. Advanced Mobile Phone Service, FCC No. 82-796 (Dec. 1, 1982), 52 R.R.2d 1104 (1982) ("Pittsburgh Order"). The Bureau stated that challenges to the dual allocation system itself were untimely; however, again embracing the reasoning of the Chicago Order, the Bureau deferred until the operating license stage the question whether AMPS should enjoy a head start. The Bureau concluded, further, that AMPS had disclosed in sufficient detail its proposed interconnection with the telephone network. Determining that the allegation that AMPS had not demonstrated its financial qualifications was frivolous, the Bureau, finally, declined to assume that Pittsburgh Bell would fail to provide MCI with a reasonable alternate form of interconnection. The Bureau stated that if no agreement on interconnection were reached by the time AMPS applied for an operating license, that license would be conditioned on the provision of a reasonable interconnection to the successful non-wireline applicant. On appeal, the Commission affirmed the Bureau's order. Like Gencom in No. 83-1720, MCI thereupon petitioned for review in this court.
 
 II
 
 25
 Before addressing the numerous challenges to the granting of construction permits in Pittsburgh and Phoenix, we observe by way of prelude that cellular technology has been available for introduction into the marketplace for over a decade. Yet only recently in a few metropolitan markets has service based upon this technology been provided to the public. Partly due to the manifest need for these new services, this court in NARUC approved a structure that had more seriously anticompetitive features than the regulatory structure which the FCC now seeks to implement. While we shall, of course, treat petitioners' various challenges on their merits, we cannot be blind to the fact that it is high time to move cellular telephone services from the FCC's regulatory process to the marketplace. To ignore this point would be to ignore Congress' fundamental mandate to the FCC to make communications systems available to the public. 47 U.S.C. Sec. 151 et seq. (1962).
 
 
 26
 * Petitioners disavow any challenge to the rules and policies laid down in the FCC's Cellular Communications Systems proceeding.[7] They do not seek to change the system of dual allocation which the FCC has imposed on cellular telephone service. Their primary contention, instead, is that the FCC must, under the head start doctrine, consider their petitions for a wireline carrier moratorium prior to granting a construction permit to the successful wireline carrier. In particular, MCI and Gencom maintain that the Commission cannot defer the moratorium determination until the wireline carrier applies for an operating license, because the pertinent statutory provision, 47 U.S.C. Sec. 319(c), guarantees that the grant of an operating license will be merely a ministerial act. Given the limited ambit of Commission review at the operating license stage, petitioners contend that section 319(c) in effect prevents the agency from inquiring into whether such a grant would be in the public interest.
 
 
 27
 * Section 319(c) of the Communications Act of 1934, as amended, is thus of pivotal importance to our analysis.[8] This provision, it should immediately be noted, applies only to licenses that are granted in a two-step authorization process. Under that system, an applicant first applies for a construction permit, which can be granted only after the Commission makes the determination as required by 47 U.S.C. Sec. 309 that the grant would be in the public interest.[9] Once the construction permit is granted and the facility is built, section 319(c) dispenses with the section 309 requirement that a public interest determination be made before the grant of an operating license. Thus, section 319(c) in essence guarantees that a carrier seized of a construction permit will duly receive an operating license, in the absence of circumstances "arising or first coming to the knowledge of the Commission since the granting of the permit."
 
 
 28
 The FCC chose to employ this familiar authorization process in licensing cellular telephone service.[10] Desiring to keep a close watch over the development and construction of cellular systems, the Commission found in the Chicago proceeding in 1982 that the public interest supported retention of the two-step process. Chicago Order, 91 F.C.C.2d 512, 519. Consistent with this statutorily authorized regime, the FCC considered whether it was in the public interest to grant construction permits to AMPS in both Phoenix and Pittsburgh; the Commission thus entertained, as required by section 309(c), petitions to deny the construction permit from interested parties, including non-wireline carriers.[11]
 
 
 29
 To this point, there was no quarrel by MCI and Gencom as to the Commission's two-step procedures. But the head start issue was quite a different matter. As to that divisive question, the FCC, as we have seen, delayed consideration of whether AMPS should enjoy a head start in the Pittsburgh and Phoenix markets until such time as the cellular facilities were constructed and AMPS thereafter applied for an operating license. The stated reason for deferral of this issue was simple: the Commission would be in a better position at that later time to assess the anticompetitive effects of a head start and thus better determine whether a moratorium should lie. See Chicago Order, 91 F.C.C.2d at 518, quoted at p. 11, supra.
 
 
 30
 Although the Commission's rationale for deferral of the head start question is tersely stated, it is both adequate and fully persuasive. Deferral does in fact place the agency in a better position ultimately to make head start determinations. Through deferral, the agency will be able to decide the moratorium issue in a concrete context and thereby avoid determinations of an issue that may become moot. Times change, and as in other areas, positions can change. For between the time the construction permit is granted and the wireline carrier is subsequently ready to begin operations, the non-wireline carrier, in the interim, may have been selected from among competing applicants. This selection may completely moot the head start issue, inasmuch as the nonwireline carrier may either begin service before the wireline carrier, or the non-wireline firm may, alternatively, deliberately choose to enter the market after the wireline carrier in order to avoid such start-up costs as advertising a new product. Should the question not be so mooted, knowledge of the capacities of the competing non-wireline carrier in the market would nonetheless be highly useful in assessing the possible anticompetitive effects of a head start.
 
 
 31
 Even if the non-wireline carrier is not chosen before the wireline carrier petitions for an operating license, the FCC will still be in a better position to assess the need for a moratorium at a time closer to the beginning of actual operations. The Commission will be better situated at that later juncture to gauge both the probable length of the head start and the need for cellular service in the market, both of which are important factors in determining whether a moratorium is in the public interest. As Gencom's counsel stated in the previously referred-to letter to the Commission,[12] "when AMPS is closer to actual operation ... the extent of competitive delay ... [is] more discernible." Phoenix J.A. 19-20.
 
 
 32
 The Commission also pointed out, persuasively, that non-wireline carriers are in no wise damaged by deferral. Chicago Order, 91 F.C.C.2d at 518. The anticompetitive effects, if any, of a head start obviously occur only when the wireline carrier initiates operations and offers its services to the public. The FCC has stated in the Chicago Order, and its counsel has reiterated to this court, that before a wireline carrier is granted an operating license the FCC will in fact entertain non-wireline carriers' petitions for a head start determination.
 
 
 33
 To all this, MCI and Gencom wrap themselves in the mantle of the statute, finding there a debilitating absence of Commission authority to impose a moratorium in the eleventh-hour setting of the operating license decision. We are firmly persuaded, however, that petitioners' argument (that section 319(c) divests the Commission of power to defer the head start determination to the operating license stage) is based on a fundamental misunderstanding of AMPS' circumstances once it has been granted a construction permit. At the time of that grant, the Commission has, to be sure, made the requisite determination under section 309 that the grant is in the public interest. But the head start doctrine does not entail revisiting the issue whether granting a license to a wireline carrier would be in the public interest; rather, the function of that policy is to analyze whether the wireline carrier's operations should be delayed for a period not to exceed six months because early entry would be, under the specific circumstances in the particular market, contrary to the public interest. In a word, while section 319(c) generally prevents the FCC from making de novo determinations at the operating license stage as to whether a license should be granted, nothing in the statute prevents the Commission from delaying the beginning of operations for a relatively short period.[13]
 
 
 34
 Moreover, since AMPS has, in effect, a guarantee in the form of its construction permit that absent new circumstances it will receive an operating license, the head start doctrine provides, in effect, for a determination whether a condition should be attached to the license requiring that service be delayed for not more than six months. It is, of course, well established that section 319(c) in no wise divests the agency of its "substantial latitude to insert conditions protective of the public interest." See Greater Boston Television Corp. v. FCC, 463 F.2d 268, 287 (1971).[14]
 
 
 35
 Nor does petitioners' argument that the underlying purpose of section 319(c) will be vitiated by deferral of the head start issue fare any better. Petitioners correctly contend that in enacting the two-step authorization process embodied in section 319 in 1954, Congress was concerned that the presence of large, illiquid investments could influence the FCC to rule in an applicant's favor in a comparative hearing for an operating license.[15] Petitioners argue from this common ground that it would be more in keeping with the rationale of section 319 to require the Commission to make all determinations at the construction permit stage, when no investment in facilities has yet occurred.
 
 
 36
 This argument simply does not ring true in the circumstances at hand. Even if this concern could accurately be said to underlie the authorization process now prescribed by Congress, it is inapposite to this case.[16] No danger whatever is looming that a decision on the head start issue adverse to AMPS will result in liquidation of its investment. Regardless of the result of the head start determination, AMPS will, as we have already seen, almost certainly obtain its operating license. An adverse determination on the head start question will merely cause a maximum six-month delay in its operations. While delay may reduce marginally the potential return on investment, this sort of loss clearly has less capacity to influence an agency than the possible destruction of an entire investment.[17] Indeed, in light of the lengthy regulatory gestation period for cellular services, it is rather hard to conclude that concern for wireline carrier profits from cellular telephone is a controlling factor in FCC decisionmaking.
 
 B
 
 37
 Besides contesting the timing of the head start determination, petitioners complain about its substance. They contend that the burden is unfairly placed on the non-wireline carrier to prove that a moratorium on wireline carrier service is in the public interest.[18] Furthermore, MCI and Gencom contend that the FCC should not take into account the possible resale of wireline carrier services as a factor mitigating the anticompetitive nature of the head start.[19] Having decided that the FCC can defer the head start determination until the operating license stage, we have no difficulty in rejecting as unripe for adjudication these contentions as to the substance of the head start determination.
 
 
 38
 We have quite recently had occasion to reaffirm the centrality of the ripeness doctrine to the judicial tradition of deciding cases in a concrete context. Tennessee Gas Pipeline Co. v. FERC, 736 F.2d 747 (D.C.Cir.1984); Air New Zealand Ltd. v. CAB, 726 F.2d 832 (D.C.Cir.1984). The obvious purpose of this familiar doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).
 
 
 39
 Here, it is evident that the administrative determination of (1) how the burden of proof will be allocated and (2) how the resale of the wireline carrier's cellular services will affect the public interest balancing has not yet been formalized in either the Phoenix or Pittsburgh proceedings. The simple reason is that the head start determination has been deferred. Nor will MCI and Gencom feel the effects of the FCC's methods for determining whether a moratorium is in the public interest until the moratorium determination is actually made. As this court has recently reiterated, "[t]he mere potential for future injury ... is insufficient to render an issue ripe for review." Alascom, Inc. v. FCC, 727 F.2d 1212, 1217 (D.C.Cir.1984) (emphasis in original). Objections to the nature of the FCC's head start determination can be brought once that determination is made.[20]
 
 III
 
 40
 * In addition to joining Gencom in its contentions as to the timing and nature of the head start determination, MCI advances two separate arguments with respect to interconnection arrangements and the financial qualifications of AMPS. First, MCI argues that AMPS has failed to satisfy the requirement articulated in Cellular Communications Systems, Reconsideration, 89 F.C.C.2d at 81-82, that a wireline carrier disclose the manner in which it proposes to interconnect with the telephone network in sufficient detail to permit the non-wireline carrier to plan its interconnection in exactly the same fashion.
 
 
 41
 The court wades into the opaque waters of interconnection theory with some circumspection. Whether AMPS has disclosed its interconnection proposal in sufficient detail is a highly technical question as to which courts necessarily must show considerable deference to an agency's expertise. See Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1026 (D.C.Cir.1978) (articulating the "obvious limitations upon the capacity of courts to deal meaningfully with arcane areas of knowledge ..."). In its application, AMPS enclosed a detailed diagram of its planned interconnection, described in detail the specific signalling features that would be required, and specified the system's loss and frequency responses. AMPS Application (May 22, 1982), Exhibit 7, Pittsburgh J.A. 43-49. MCI impugns the documents AMPS has provided, finding this information unsatisfactory. Nonetheless, MCI does not tell us precisely what other information it wants. We simply decline, under these circumstances, to overturn the agency's decision in this respect.
 
 B
 
 42
 MCI also complains that Pittsburgh Bell, the local telephone company, refuses to treat MCI's operation as a "class 5 office" and thus has failed to provide the needed quality of interconnection. MCI suggests that this quality of interconnection is its due as a form of "reasonable" alternative interconnection that Cellular Communications Systems, 86 F.C.C.2d at 495, Reconsideration, 89 F.C.C.2d at 81, permitted to a non-wireline carrier if it chooses not to use the kind of interconnection which the telephone company provides to its own cellular subsidiary.[21] Exactly what MCI wants in asking for interconnection as a class 5 office is not entirely clear. It is sufficient for our purposes, however, to observe that MCI does not want to be connected to the telephone network in the same manner as a switchboard or centrex system; rather, MCI desires direct access to the telephone network's internal signalling system. This form of interconnection is, however, apparently of a higher quality than AMPS or its successors-in-interest will receive from their own parent telephone companies.
 
 
 43
 In its decision, the FCC did not deny that MCI may be entitled to this lofty form of interconnection; instead, the Commission delayed consideration of this issue until AMPS applied for an operating license. The Commission stated that "if reasonable interconnection arrangements have not been formulated by [that] time ... any grant to AMPS [of an operating license] will be conditioned upon its providing reasonable interconnection." Pittsburgh Order, 52 R.R.2d at 1109 n. 8. MCI, however, contends that this deferral is an abuse of discretion and contrary to section 319(c).[22]
 
 
 44
 To the contrary, we think that deferral is entirely reasonable and consistent with the statute. Like deferral of the head start determination, deferral of the interconnection issue permits the agency to avoid the premature determination of questions that may be pretermitted by the course of events. For one thing, the telephone company in the course of negotiations may provide MCI with an interconnection that the latter deems entirely satisfactory. For another, while hope may spring eternal in the applicant's breast, MCI may not in fact be successful in the comparative hearing for the non-wireline carrier license. Either circumstance, as unthinkable as the latter may be to MCI, would obviously moot the issue.
 
 
 45
 As if more were needed, the Commission has yet another reason for deferral in light of Commission-sponsored industry meetings to establish interconnection standards.[23] The Commission cannot be expected to make decisions in a vacuum about the reasonableness of interconnection arrangements in this highly technical area. The alternative of holding construction permits hostage until the meetings produce final technical guidelines would engender still further delay of cellular service.[24]
 
 
 46
 Finally, deferral here does not harm MCI because, as of early 1984, MCI had not yet been chosen for a non-wireline carrier license in the Pittsburgh market and had thus not been granted a construction permit. Therefore, MCI does not have a present operational need to select an interconnection system.[25] For these reasons, we conclude that the FCC's decision to defer the question of whether MCI is being provided with a reasonable alternate form of interconnection is not an abuse of agency discretion.
 
 
 47
 We also conclude that the FCC's deferral to the operating license stage of the issue of what constitutes reasonable interconnection does not violate section 319(c) for the reasons set forth in II A, above, approving deferral of the head start determination. Nothing in the statute prevents the Commission from conditioning the wireline carrier's operating license on reasonable interconnection arrangements, especially when that carrier is on notice of this requirement.
 
 C
 
 48
 Finally, MCI claims that AMPS has not demonstrated its financial qualifications to operate a cellular telephone system in the Pittsburgh market as required by 47 C.F.R. Sec. 22.917.[26] The FCC dismissed this challenge as bordering on the frivolous. We agree.
 
 
 49
 MCI's principal objection is based on the contention that AT & T, at the time the parent company of AMPS, sought confidentiality for information which it had furnished to the Commission to satisfy financial qualification requirements. While AT & T did seek confidentiality for some financial information,[27] AMPS' financial qualifications are clearly demonstrated by publicly available information. AMPS satisfied section 22.917(a) by submitting estimated construction costs and operating expenses for its Pittsburgh services. AMPS Application (May 22, 1982), Exhibit 10, Pittsburgh J.A. 21. To satisfy sections 22.917(c) and 22.917(e), AMPS referred in its Pittsburgh application to a balance sheet submitted in AT & T's capitalization plan. That balance sheet was publicly on file with the Commission. Id. This financial statement showed that AMPS initially received assets of $25.8 million and had an additional commitment from AT & T of $907.9 million. See American Telephone and Telegraph Co., FCC No. 83-12 (March 31, 1983), 53 R.R.2d 1083. To satisfy the requirement of section 22.917(b), AMPS declared that resources devoted to the Pittsburgh project did not include funds committed to other cellular projects that AMPS was undertaking around the country. Thus, AMPS satisfied the regulatory requirements based on publicly available information, and the FCC, accordingly, by no means erred in deeming AMPS financially qualified in the Pittsburgh proceeding.
 
 IV
 
 50
 For the reasons stated, we reject the various challenges mounted by MCI and Gencom to the FCC's decision to grant AMPS a permit for construction of cellular facilities in Pittsburgh and Phoenix. The Commission's orders are therefore
 
 
 51
 Affirmed.
 
 
 
 *
 Of the United States Court of Appeals for the Federal Circuit isttin gby designation pursuant to 28 U.S.C. Sec. 291(a)
 
 
 [1]
 Inasmuch as the FCC's order was issued in 1981, no account obviously was or could have been taken of the corporate reorganization of AT & T effected in January 1984
 
 
 [2]
 As a common carrier, the wireline licensee is required to sell cellular service to all who desire to purchase it. The FCC prohibition of resale restrictions therefore permits non-wireline carriers to purchase the service from a wireline carrier and resell that service to consumers. Thus, a secondary tier of competition is created at the retail level
 
 
 [3]
 To ensure compliance with the requirement of equality of interconnection, the FCC concluded that a wireline carrier must disclose in its application the manner in which its system would interconnect with the local telephone network. General or vague disclosures were forbidden. Rather, the Commission required that disclosures with respect to proposed interconnection arrangements be "sufficiently specific to enable a potential competitor to design its system to connect with the ... network in exactly the same fashion." Under the Commission's policy, the wireline carrier's license would be conditioned on making such equivalent interconnection available to the non-wireline competitor. Reconsideration, 89 F.C.C.2d at 81-82
 The Commission did not specify what types of interconnection equipment wireline carriers would have to supply to satisfy this interconnection duty. Stating that a general rule on required interconnection was inappropriate "in a dynamic technological environment," id. at 81, the FCC decided instead to sponsor meetings of industry groups to develop solutions to these technically difficult questions. These groups, comprised of telephone companies, non-wireline carriers, engineering consultants, equipment manufacturers, and other interested parties, were still convening as of late February 1984 when this case was argued, and further convocations were anticipated.
 
 
 [4]
 After the reorganization of AT & T on January 1, 1984 pursuant to the now well-known antitrust consent decree, AMPS was divided into regional companies. Its successor-in-interest in Phoenix is intervenor New Vector Communications, Inc. Its successor-in-interest in Pittsburgh is intervenor Bell Mobile Systems of Pittsburgh, Inc. Because the FCC granted construction permits to AMPS rather than to its successors-in-interest, we will for convenience refer to the wireline carriers in both Pittsburgh and Phoenix as AMPS
 
 
 [5]
 At the time MCI petitioned the FCC to deny AMPS' application, Pittsburgh Bell was the local operating subsidiary of AT & T. Now Pittsburgh Bell is part of one of the independent regional telephone companies created as a result of the reorganization of AT & T. See supra note 4
 
 
 [6]
 A "class 5 office" is an office connected directly to the telephone's internal signalling system. Such an office provides local exchange service to customers. See Bell Telephone Laboratories, Engineering and Operations in the Bell System at 91-92 (1977). For further discussion of the kind of interconnection MCI is seeking, see infra III B
 
 
 [7]
 Reply Brief of Gencom at 23; Transcript of Oral Argument at 16 (February 24, 1984). MCI thus no longer pursues the argument advanced before the Common Carrier Bureau that the entire dual allocation policy is anticompetitive and contrary to the public interest
 
 
 [8]
 47 U.S.C. Sec. 319(c) provides:
 Upon the completion of any station for the construction or continued construction of which a permit has been granted, and upon it being made to appear to the Commission that all the terms, conditions, and obligations set forth in the application and permit have been fully met, and that no cause or circumstance arising or first coming to the knowledge of the Commission since the granting of the permit would, in the judgment of the Commission, make the operation of such station against the public interest, the Commission shall issue a license to the lawful holder of said permit for the operation of said station. Said license shall conform generally to the terms of said permit. The provisions of section 309(a)-(g) of this title shall not apply with respect to any station license the issuance of which is provided for and governed by the provisions of this subsection.
 
 
 [9]
 Section 309(a) provides:
 Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.
 Section 308, in turn, applies both to construction permits and operating licenses.
 
 
 [10]
 The Commission so elected notwithstanding the passage of the Communications Amendments Act of 1982, which dispensed with the requirement of a two-step authorization process for common carriers. See Communications Amendments Act of 1982, Pub.L. No. 97-259, Sec. 119, 96 Stat. 1096. This Act, however, by no means precluded Commission utilization of the well-worn and familiar two-step process; to the contrary, the 1982 Act expressly allowed the FCC to employ the two-step process if it found that process in the public interest
 
 
 [11]
 It will be recalled that Gencom, unlike MCI, did not file a petition to deny AMPS' Phoenix application
 
 
 [12]
 See supra text at p. ----
 
 
 [13]
 Of relevance to this branch of our inquiry is case law of considerable vintage in this circuit suggesting that section 319(c) is not a bar to delaying a license when the agency has sound reasons for imposing the delay. See Harbenito Broadcasting Co. v. FCC, 218 F.2d 28 (D.C.Cir.1954) (upholding the agency's delay in issuing an operating license to a holder of a construction permit pending the outcome of a related proceeding against the challenge that the delay violated section 319(c))
 
 
 [14]
 AMPS cannot complain that this condition disturbs the "high degree of protection that section 319(c) provides holders of construction permits," Frontier Broadcasting Co. v. FCC, 296 F.2d 443, 445 (D.C.Cir.1961), since at the time the construction permit was granted, the FCC made it clear that a six-month moratorium may be imposed under the head start doctrine when AMPS applied for an operating license. See Sec. 319(c) (providing that the license will conform to the terms of the permit); cf. Wentronics, Inc. v. FCC, 331 F.2d 782 (D.C.Cir.1964) (holding that an applicant who accepts a construction permit subject to certain conditions may not retain the grant and be relieved of the conditions to which it is subject)
 
 
 [15]
 See S.REP.NO. 507, 83d Cong., 1st Sess. 3 (1954) U.S.Code Cong. & Admin.News 1954, pp. 2098, 2099 (stating that the purpose of deciding significant issues at the construction permit stage is to free the Commission from "the pressure which might otherwise be exerted" when an applicant has made investments which might be "difficult to liquidate")
 
 
 [16]
 The potential agency bias in favor of applicants whose facilities have already been constructed now seems to be viewed as a less pressing concern by Congress. As we have noted, the Communications Amendments Act of 1982 no longer requires that the FCC issue a construction permit as the first step of a two-step authorization process for common carriers. Thus, unless the agency determines that it is in the public interest to have a two-step process, it may make decisions about granting operating licenses to facilities already built. Congress thus appears to be less concerned about potential agency bias in favor of licensing facilities already built than about administrative inefficiencies and delays. See H.R.REP. NO. 765, 97th Cong., 2d Sess. 51-52 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2237, 2295-2296 (stating that the old two-step process "may delay market entry and place an unnecessary administrative and financial burden on both the potential licensee and on the Commission"). As we have seen, the FCC's deferral of the head start question promotes administrative efficiency
 
 
 [17]
 In a similar way, we distinguish Community Broadcasting Co. v. FCC, 274 F.2d 753 (D.C.Cir.1960), cited by petitioners for the proposition that deferring determinations until facilities are constructed is disfavored. The Community Broadcasting court vacated the FCC's decision to grant a "temporary" license of a potential three-year duration to construct and operate a station without first conducting a hearing among competing applicants. The court reasoned that the potential damage to the "temporary" licensee's investment in facilities might influence the FCC's decision in the comparative hearings which would ultimately be held. In this case, however, AMPS faces no comparative hearing, and no possibility, save for highly exceptional circumstances, of having to liquidate its entire investment at distress-sale prices
 
 
 [18]
 Gencom contends that the Commission ignored evidence submitted to establish that AMPS' head start would be anti-competitive. This evidence consisted of an extensive marketing study and an economic analysis of the Phoenix market. If the Commission chooses to disregard this evidence at the operating license stage, Gencom will be at liberty to renew its contention that relevant evidence which has properly been proffered is nonetheless improperly being ignored
 
 
 [19]
 For a discussion of reselling cellular services, see supra note 2
 
 
 [20]
 The FCC argues that since the burden of proving the necessity of a moratorium on wireline services was allocated to the non-wireline carrier in Cellular Communications Systems, 86 F.C.C.2d at 491 n. 57, appellants should not be able to challenge the allocation in the context of a licensing proceeding. As we dismiss the particular challenges as unripe, we need not and do not pass on this question
 
 
 [21]
 In Cellular Communications Systems, the FCC specifically refused to hold that interconnection of a cellular system as a class 5 office would always be appropriate. 86 F.C.C.2d at 496; Further Reconsideration, 90 F.C.C.2d at 577. In view of our affirmance of the FCC's deferral of the issue as to what constitutes a reasonable alternative form of interconnection in MCI's case, we need not reach the question of whether a class 5 office interconnection is appropriate here
 
 
 [22]
 For the text of section 319(c), see supra note 8
 
 
 [23]
 See supra note 3
 
 
 [24]
 Petitioner complains that these meetings, which began in November 1982, see Public Notice, "Cellular Radio Interconnection Working Groups," CC Mimeo 1036 (Nov. 26, 1982), have been moving at a desultory pace. In view of the undisputedly complex nature of interconnection arrangements and the fact that interim reports have been issued, see AT & T Technical Advisory No. 76, Issue 2 (March 31, 1983), we cannot say that the FCC at this point is abusing its discretion in awaiting these reports
 Petitioner also points to evidence that in other contexts AT & T strung out negotiations over interconnection arrangements to forestall competition. See, e.g., United States v. American Telephone and Telegraph Co., 524 F.Supp. 1331, 1333, 1353 (D.D.C.1981) (denying Rule 41(b) motion to dismiss the Government's antitrust case in part because the Government's evidence tended to show that AT & T had conducted certain interconnection negotiations in bad faith). MCI, however, has presented no evidence of anticompetitive animus in the cellular negotiations and the Commission has made no finding that AT & T is negotiating in bad faith. Moreover, the FCC's decision to condition operating licenses on the provision of reasonable interconnection should give wireline carriers, including those that were formerly subsidiaries of AT & T, an incentive to negotiate in good faith.
 
 
 [25]
 MCI argues that deferral could cause it harm if it received a construction permit before AMPS applied for an operating permit. MCI then might be in need of an interconnection arrangement before the FCC had conditioned AMPS' operating license for Pittsburgh on the provision of reasonable interconnection arrangements. We decline to allow this scenario, which is remote and speculative, to invalidate a policy of deferral that has strong merit in the normal course of events. If such an occasion were to arise and the FCC had reason to suspect that AMPS was unreasonably delaying the provision of interconnection arrangements, the agency could move under 47 U.S.C. Sec. 416 to modify AMPS' construction permit so as to condition it on the provision of reasonable interconnection arrangements
 
 
 [26]
 This provision states in pertinent part:
 (a) Applications for new stations or modified facilities shall demonstrate the applicant's financial ability to meet the realistic and prudent:
 (1) Estimated costs of proposed construction and other initial expenses; and
 (2) Estimated operating expenses for a period of one year, considering the nature of service proposed and the degree of business uncertainty or risk.
 (b) Resources used to demonstrate an applicant's financial ability under paragraph (a) of this section cannot include funds committed to another project, or committed in another cellular application.
 (c) Except as provided in paragraph (d) of this section, each application shall demonstrate an applicant's financial ability under paragraph (a) of this section by submitting the following financial information, the information required by paragraph (e) of this section, and whatever other information or details the Commission may require:
 (1) A balance sheet current within ninety (90) days of the date of the application and copies of any financial commitments (such as, for example, loan agreements and service contracts) in support of the proposed facilities; and
 (2) Whenever the submissions of paragraph (c)(1) of this section do not satisfy paragraph (a) of this section, the applicant shall submit additional information (e.g. a current income statement, and, for the period of proposed construction plus one year operation, a statement of projected revenues and expenses, a statement of projected sources and application of funds, etc.) as is necessary to demonstrate financial ability.
 (d) ...
 (e) The following additional information shall be submitted on any form of intended credit arrangement or equity placement:
 (1) The details of any loan or other form of credit arrangement intended to be utilized to finance the proposed construction, acquisition, or operation of the requested facilities including such information as the identity of the creditor (or creditors), letters of commitment, terms of the transaction, and a statement that paragraph (f) of this section is complied with; and
 (2) The details of any sale or placement of any equity or other form of ownership interest.
 
 
 [27]
 AT & T provided the information for which it sought confidentiality in the course of the FCC's determination whether AT & T's capitalization plan for AMPS satisfied a regulation designed to prevent cross-subsidization of cellular and regular telephone services. See 47 C.F.R. Sec. 22.901(b)-(d). MCI seems to confuse this regulation, which requires that any cellular operations of AT & T be carried out by a fully separated subsidiary with separate facilities, officers, operating personnel, and books of account, with the separate requirement that any carrier, wireline or non-wireline, prove its financial ability to operate a cellular telephone service. AT & T's capitalization plan for the separate subsidiary, AMPS, was approved by the FCC in American Telephone and Telegraph Co., FCC No. 83-12 (March 31, 1983), 53 R.R.2d 1083. While MCI initially appealed this decision, its petition for review has now been dismissed on MCI's own motion. See MCI Cellular Telephone Co. v. FCC, No. 83-1658 (D.C.Cir. Sept. 12, 1983)